886 So.2d 965 (2004)
Darius Mark KIMBROUGH, Appellant,
v.
STATE of Florida, Appellee.
Darius Mark Kimbrough, Petitioner,
v.
James V. Crosby, Jr., Respondent.
Nos. SC02-1158, SC03-228.
Supreme Court of Florida.
June 24, 2004.
Rehearing Denied as August 31, 2004.
*968 Robert T. Strain, Assistant CCRC and Carol C. Rodriguez, Assistant CCRC, Capital Collateral Regional Counsel  Middle Region, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
Rehearing Denied as to SC02-1158 August 31, 2004.
PER CURIAM.
Darius Mark Kimbrough appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus.[1] We affirm the circuit court's order denying Kimbrough's rule 3.850 motion, and we deny Kimbrough's petition for a writ of habeas corpus.

FACTUAL AND PROCEDURAL BACKGROUND
Kimbrough was convicted of first-degree murder on July 1, 1994, and was sentenced to death on December 9, 1994. His conviction and sentence were affirmed by this Court on direct appeal. The relevant facts as taken from the opinion on direct appeal are:
Kimbrough was convicted of first-degree murder, burglary of a dwelling with a battery therein, and sexual battery with great force and was sentenced to death consistent with a jury recommendation of eleven to one. The victim, Denise Collins, was found nude and semi-conscious in her bathroom by paramedics; she was covered with blood. The sliding glass door to her second floor apartment was partially open, and there were some ladder impressions under the balcony. Collins was rushed to the hospital, where she died soon thereafter.
The officers took semen evidence from the bedsheets, took blood evidence from *969 the victim, and found pubic hairs in the bed and in a towel. The samples were sealed in a bag and sent to the Florida Department of Law Enforcement lab for analysis.
A resident of the apartment complex  Lee  told officers that he had twice seen a man in the vicinity of the apartment and had seen a ladder on the apartment's balcony. Officers were unsuccessful in searching for the man, but later Lee identified Kimbrough from a picture lineup. A workman in the complex  Stone  identified Kimbrough as a man who had watched him putting away a ladder in the complex around the time of the murder.
The DNA evidence showed that the semen taken from the bedsheets was compatible with Kimbrough's, and some of the pubic hairs matched his. There were, however, additional pubic hairs from another unidentified black man and a caucasian male. The DNA evidence indicated that the blood samples taken from the bed matched Kimbrough's.
The medical examiner testified at trial that the victim had a fractured jaw and fracturing around her left temple. The cause of death was hemorrhaging and head injury in the brain area resulting from blunt injury to the face. There was also evidence of vaginal injury, including tears and swelling consistent with penetration. There were bruises on her arms.
The defense's theory suggested that the victim's ex-boyfriend  Gary Boodhoo  had committed the crime since he was with the victim shortly before, had used a ladder before at her apartment, had a key, and had beaten her previously. The evidence of prior beating was excluded.
In the sentencing order, the judge listed three aggravators: prior violent felony, committed during the course of a felony, and heinous, atrocious, or cruel (HAC). To support the prior violent felony aggravator, the judge cited Kimbrough's prior convictions for both burglary of a dwelling with battery therein and sexual battery. The court found that the murder here was committed during sexual battery or attempt to commit sexual battery, citing DNA evidence and bruising, as well as evidence that the victim and defendant did not know each other. HAC was supported by the size of the victim, the three blows to her head causing fracture by blunt force, evidence of a struggle (the room was in disarray), and the amount of blood found around the room.
The judge considered age as a statutory mitigator (Kimbrough was nineteen), but rejected it because there was no evidence establishing that he was immature or impaired. The court considered the following nonstatutory mitigation: Kimbrough had an unstable childhood, maternal deprivation, an alcoholic father, a dysfunctional family, and a talent for singing. The court found that the mitigation did not temper the aggravators.
Kimbrough v. State, 700 So.2d 634, 635-36 (Fla.1997).
Kimbrough filed a rule 3.850 motion on July 30, 1998, and an amended motion on March 10, 2000, raising twenty claims.[2] *970 The court held a Huff[3] hearing on September 22, 2000. At the hearing, Kimbrough dropped three of his claims,[4] and the court granted an evidentiary hearing on three other claims.[5]
On April 26, 2002, after an evidentiary hearing, the court issued a detailed twenty-seven-page order denying Kimbrough 3.850 relief on all of his claims. This appeal followed.
Kimbrough appeals the denial of relief on claim nineteen and the denial of an evidentiary hearing on claims two, four, six, seven, and eighteen. Kimbrough also petitions this Court for a writ of habeas corpus.

I. AKE CLAIM
Kimbrough alleges that his trial counsel was ineffective and deprived him of the expert mental health assistance required by Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). He alleges that defense counsel was ineffective for failing to call mental health experts, for failing to provide mental health experts with sufficient background information, and for failing to present statutory and nonstatutory mitigating evidence.
The State argues that the two experienced defense attorneys in this case provided extensive background evidence to the jury and hired two well-qualified experts to examine Kimbrough prior to the penalty phase. The State argues that trial counsel made a reasonable strategic decision not to present expert testimony during the penalty phase. Testimony from the evidentiary hearing on this claim is summarized below.

Testimony of Defense Counsel
Kimbrough was represented at trial by two attorneys, Patricia Cashman and Kelly Sims. Both Sims and Cashman are *971 very experienced in capital cases. Cashman testified that Dr. Eric Mings, a forensic criminal psychologist, was retained to conduct a psychological evaluation of Kimbrough and was originally listed as a defense witness. On February 11, 1994, prior to trial, Cashman filed a notice striking Mings from the witness list. Mings was removed from the list quickly so that the State could not depose him. Although she could not recall all of the reasons she had for striking Mings from the witness list, she stated that one of the reasons she struck Mings was because of the things Mings said about Kimbrough being a "psychopathic deviant" and the fact that she thought such testimony would hurt him in front of the jury. Cashman testified that the decision not to call Mings was a joint decision, made by her and Sims, and stated that before making such a decision she would have asked Mings whether he thought he could be helpful as a witness.
At the hearing, Cashman reviewed a note she wrote while preparing for the Kimbrough trial. The note reflected that Kimbrough denied having any problems, had relatives in Tennessee, was raised by his stepfather, and had no history of abuse. The "worst thing that happened to him" was that his cousin was killed at the age of sixteen. Kimbrough won talent show trophies for singing and had an intelligence quotient (IQ) of seventy-six, which was in the fifth percentile on the Wechsler Adult Intelligence Scale test (WAIS). He had an MMPI (Minnesota Multiphasic Personality Inventory) which was valid, but defensive. The note also stated that there was a spike on "scale four, psychopathic deviant[6] endorsing items consistent with family discord, other scales normal." She did not recall what exactly Mings told her about the psychopathic deviate scale.
Cashman had defended a number of cases prosecuted by Jeff Ashton, the prosecutor in this case, and was familiar with him and his trial tactics. She stated that Ashton liked to use a spike on scale four of the MMPI "[t]o make my client look really dangerous and make the jury scared of him and want to kill him."
In addition to Mings, Cashman retained Dr. Robert Berland, a forensic psychologist, to conduct a pretrial evaluation of Kimbrough. Cashman apparently retained Berland in an attempt to find an expert who might be more favorable to Kimbrough for mental health mitigation purposes. Although Berland thought there were mental health issues which could have been presented at the penalty phase, he thought they would be difficult to present to the jury. Cashman chose not to put Berland on the stand because she thought he would testify that Kimbrough had "hidden craziness." She was concerned that the prosecution would portray Kimbrough as faking mental illness and noted that Berland's intelligence testing, which gave Kimbrough an IQ of ninety-four, placed him in the normal range of intelligence. Cashman was aware that the cutoff for mental retardation was seventy and that seventy-six reflected a low IQ.
Cashman testified that she always ensured the mental health experts she retained had adequate background information on her clients. She recalled that Kimbrough's family members were not particularly cooperative in this case.
Kelly Sims, Cashman's cocounsel, was certain that he had telephone conversations *972 with Mings prior to the time Cashman wrote the note that was found in Kimbrough's file. Sims stated that his practice at the time was not to write notes that could prove harmful to his client because he thought they could fall into the wrong hands. Although he said Cashman was better at taking notes than he was, "she was specifically never going to put anything down that may hurt her client." Sims explained any absence of notes from Cashman is evidence "that something bad happened because she is a prolific note-taker." He did not recall any specific reasons for striking Mings from the witness list but said, "[I] know we must have talked about it and I was in agreement with it." Sims further stated that if he had thought striking Mings was a mistake, he would have relisted him.
Sims testified that he thought Berland was retained as a second opinion to try to develop some mental health issues. He did not recall whether retaining Berland was his idea or Cashman's. Sims testified that there was nothing in the public defender file that would tell him why Berland was not used but stated that the decision would have been made based on what Berland was going to testify to at trial.
With regard to waiving potential mental health mitigation, Sims testified that while others may have had input on the decision, ultimately it was his choice and his decision. He did not remember discussing with Kimbrough the decision not to present mental health mitigation. Sims testified that he did not want any record discussion of the issue and said, "I just did not want to bury any hope for Mark Kimbrough later down the line. And I think that's what Ashton was trying to do. And that's not my job to help clean up the State's case." Sims stated: "I know that in my relationship with Mr. Kimbrough I had laid out everything that we did and talked about the pros and cons of it and thought I would make some coherent cohesive argument about why we had to do A, B, or C and spent hours talking about it." But, Sims thought he did not have a very good level of communication with Kimbrough. When asked about the theme of any mitigation defense, Sims stated:
I recall that the theme was thread bare, that the main theme was that it didn't seem Mark had all that high of an IQ with respect to just dealing with figuring out problems in his life.
It seemed like he had a lot of people that loved him and a lot of family that embraced him and that kind of can be contra to finding good mitigation going because people were kind of, I mean, his family wanted him and wanted to help him and I guess there was a little bit of, back when he was a teen, I can recall that some of the family members saying we wanted him to live with us and they said, no, we want him to live with us.
I know he was a skilled singer.
He had gifts to share in that field.
But as far as being able to show physical abuse or sexual abuse and some kind of brain injury or organic brain dysfunction, I don't recall us having any of that.
Sims thought that a low IQ was a potential mitigator but noted that there are plenty of inmates on death row who have been found to have IQs similar to Kimbrough's. Moreover, Sims stated that part of his argument during the guilt phase was that Kimbrough would have been really dumb to rape and murder a girl in his own apartment complex, to let another person see him with a ladder, and to then watch the next morning while all of the crime scene investigators and detectives were there. Sims worried that if they presented the low IQ evidence, it might have led the jury to think, "Well, he might be a *973 dope, so he would do something that would [make it] easy to catch him."

Testimony of Prosecutor
The State called Jeffrey Ashton, the prosecutor at Kimbrough's trial. Ashton was familiar with Cashman and Sims. Ashton testified that an elevation on scale four, psychopathic deviate, was the one he hoped for on an MMPI. He stated: "It is the one which, just by its name, is most appealing to a prosecutor. Because, when you can argue to a jury that this man has a high psychopathic deviant [sic] scale, just those words alone are a wonderful argument for a jury." The words alone have a negative connotation. Ashton further stated:
[M]y experience generally is that when you ask for a definition of what does psychopathic mean, the definition you get is one of someone, you know, who lacks a well-developed conscience, you know, does not feel remorse, guilt, things of that general way. So it's something that it's hard to spin that as positive or sympathetic in my experience.
Ashton stated that if he had known a scale four would come up, he would have used experts to characterize Kimbrough as dangerous. He would have gone into the characteristics of psychopathy, would have quoted some of the "less favorable descriptions of psychopaths," and would have equated psychopathy to antisocial personality disorder. He also stated he would have questioned expert witnesses about their knowledge of Kimbrough's prior criminal acts, both charged and uncharged, and would have asked about previous known acts of violence.
As to a potential "remorse" mitigator, Ashton testified that "[e]xpressions of remorse, when you're in jail, after you've been caught and convicted, you know, are risk for argument of the insincerity of the supposed remorse." He further noted that the remorse argument opens the door to testimony as to the actions or conduct of the defendant that are inconsistent with remorse. Questions of character and the like generally open the door to questions about the full range of the defendant's possible misconduct. In this case, it might have opened the door for evidence that Kimbrough had previously been involved in a gang fight.

Testimony of Defense Investigator
The State called Barbara Pizarroz, the defense investigator. In the course of investigating Kimbrough's case, Pizarroz spoke with some twenty-two witnesses, obtained school and medical records, and spoke with Dr. Berland in an attempt to find some supporting data for brain damage. She met with Kimbrough's family members, friends, teachers, and coaches. Pizarroz traveled to Memphis as part of her investigation. She also met with Kimbrough on a number of occasions. She testified that for the most part he had a family who loved him.
Pizarroz testified:
For the most part, and I just don't want to get personal, but for the most part he has a family who just absolutely loves him. They spoke well of him, very caring. They were, you know, all totally devastated by this incident. And for the most part, you know, he had a family that absolutely loved him. But he was kind of shuffled from family member to family member, you know, when he was young.
As far as his parents are concerned, that was a situation where Mark ... learned as a young boy that he was fathered by someone other than who he believed to be his father. And then he became involved with another gentleman who was with his mom for, I don't know, *974 six or eight years who took on a father figure.
Prior to Kimbrough's trial, Pizarroz had worked on a number of cases with Berland, obtaining information that Berland needed to make his evaluation. In general, she was familiar with what information a mental health expert would need in a first-degree murder case. By the time she investigated the Kimbrough case, she had worked dozens and dozens of cases where the mental health aspect of a case was important. Pizarroz was also familiar with Mings and had supplied information to him for past evaluations.

Testimony of Mental Health Experts
Mings testified that a spike on scale four, psychopathic deviate, is not a formal DSM[7] diagnosis. He could not recall diagnosing Kimbrough with antisocial personality disorder, but it was possible that he discussed antisocial personality with Cashman as a possible diagnosis for Kimbrough. He stated that scale four of the MMPI measures traits which are found in persons with antisocial personality disorder but noted that such traits can also be found in normal people. Mings spent about eight hours with Kimbrough in testing and then another seven hours or so scoring the tests, reviewing background materials, and talking to attorneys. He requested an additional five hours for background material, and while he had no clear recollection, his impression was that he did not get much from Kimbrough and wanted to talk to other people to find out more details.
Dr. Bill Mosman, a forensic psychologist and practicing attorney from the Miami, Florida, area, testified regarding potential statutory and nonstatutory mitigators which were not introduced at trial. Mosman reviewed various materials provided by Berland, reviewed the work of Dr. Sidney Merin, the State's mental health expert, reviewed the sentencing transcript, reviewed school records, and had conversations with Berland. Mosman did not personally examine Kimbrough prior to testifying and did not administer any tests to Kimbrough. He reviewed the defense investigator's file and recognized that Pizarroz "did voluminous amounts of work." From his review of the materials, Mosman thought that "from a statutory point of view, there were 5 statutory mitigators that were available and well reasonably could have been argued. From a hyper technical point of view there were three, but two of those are disjunctive." As to the potential statutory mitigators, Mosman stated:
They are a felony was committed while under the influence of extreme mental disturbance, felony committed while under the influence of extreme emotional disturbance, and mental is different than emotionally, capacity to appreciate the criminality of his conduct was substantially impaired, capacity to conform his conduct to the requirements of law was substantially impaired.
Age of the defendant at the time of the crime clearly, clearly, multiple severe impairments in that area, these are the statutory ones.
Mosman testified that his review of the record and applicable case law revealed some thirty nonstatutory mitigators that could have been argued to the jury. Mosman stated:
The 30 are clearly a potential, an ability to be rehabilitated. There is a lack of family life that's separate. And background. *975 Those are not the same ones. To collapse them is a complete misunderstanding of what the mental health process and the development of the child is all about.
There was history of neglect, disadvantage or deprived childhood, clearly educational deficits, emotional impairments, and results of any emotional disturbance. Those are separate and separately found in forensic materials and training in cases, emotional disturbance, even if not extreme.
There is extreme mental or emotional disturbance which is separate again, mental impairments, both cognitively and intellectually in the record. It's right in the data base.
Medical problems or history of injuries that is in the records, utilization, drugs or alcohol, previous contributions to the community or society. That was, is, and existed in the records. Psychological difficulties.
There is another one that's recognized and it's a tongue twister. It's called iatrogenises from the systems and it's spelled "iatrogenises." Forensically, that's described as systems aware of problems and fail to deal with it. And we'll get into what that means later.
Remorse, positive confinement record, excuse me, and because I am testifying today and all of those record we would add another one, a good prison record. There is another one, behavior during trial. Those are disjunctive, not the same thing at all. Non anti-social personality, cannot be diagnosed, and that has to be a non-statutory mitigator in these types of situations. Can function in a structured environment. That's a separate one. Crime, itself, was out of character to the preincident situation Another one, he lost his cousin several years ago. Any impact that had on him. Failure to maintain relationship with family members that is in the records and it has been separately to be found mental health related non-statutory mitigators.
Mild brain abnormality. I will say that again. Mild brain abnormality. M.V.D. mental, grew up without a father is separate from the background issue and lack of family life, educational difficulties, positive traits and I can't even read my handwriting here. Yes. I can.
Mental and emotional handicaps, so those in a summary and while I understand some sound similar, they are actually different but the last one or two perhaps from a real technical mental health perspective, they are separate they enter play out on what was going on here so I think that if you count them up, that would be 30 non-statutory and 5 statutory from a mental health perspective.
Mosman also testified that Kimbrough had an extreme emotional disturbance at the time of the crime due to various stressors which were acting on his life.
Mosman stated that Kimbrough's capacity to conform his conduct to the requirements of the law was substantially impaired. This impairment was based upon the lack of "stability" or "consistency" in Kimbrough's upbringing. During his upbringing, Kimbrough learned that if he had emotional needs he had to take care of them himself.
In support of the statutory age mitigator, Mosman explained that "[a]ge has to do with mental age, developmental age, social age, intellectual age, moral age." Kimbrough rated a ten percentile rating "from all the years of academic functioning." His school records also reflected annual testing where "76 out of 100 of his same age peers were educationally much more sophisticated and skilled than he." *976 Mosman calculated that based on an IQ of seventy-six, Kimbrough had the intellectual efficiency of a thirteen-year-old child. Kimbrough's emotional age, his ability to relate and engage in mature interpersonal relationships, was also low.
On cross-examination, Mosman acknowledged that this was not the first time he had testified in a capital case that a defendant's mental age does not match his chronological age. He had previously testified that a thirty-eight-year-old man had the mental or developmental age of a fourteen-year-old. Mosman was not aware that this Court upheld the trial court's rejection of this proposed mitigator because his opinion was contradicted by the other twenty-five witnesses called by the defense during the penalty phase. He agreed that none of the various IQ test scores in this case placed Kimbrough in even the mild mental retardation range.
Mosman noted that Pizarroz found notes from a long-term girlfriend of Kimbrough's who said that he was well-mannered and stated that Kimbrough was able to maintain relationships with "cousins, aunts, uncles, people that he met." Relying on this evidence, Mosman testified that a jury could conclude that the Collins rape and murder, followed by one other rape[8] was out of character for Kimbrough. Mosman referred to a Federal Bureau of Investigation manual describing the various types of rapes and concluded that Kimbrough's second rape fit the "expressions of relationship fantasies" category. On cross-examination, however, Mosman agreed that his testimony concerning relationship "fantasy rape" was made without having talked to Kimbrough about what he was thinking at the time he committed the rape.
Mosman stated that mild brain abnormality might be found in the frontal lobe and "could have been argued." He thought the Weschler and MMPI tests could be used to argue brain damage or abnormality even though a PET scan rendered a normal reading. Although Mosman did not administer any tests to Kimbrough, he thought referrals could have been made to obtain additional testing.
Mosman noted that Kimbrough exhibited no evidence of a conduct disorder prior to the age of fifteen, was not aggressive, was not a disciplinary problem in school, and behaved well with his family. Accordingly, Mosman said that antisocial personality disorder could not be diagnosed in this case.
On cross-examination, Mosman said that he has been called to testify in thirty to thirty-five homicide and capital postconviction cases in Florida since 1990. In each of these cases, Mosman was called by the defense. When asked about the underlying data to support his opinion that the statutory mental mitigators applied at the time of the crime, Mosman asserted that he relied upon Kimbrough's traditional level of functioning. However, Mosman agreed that he did not talk to Kimbrough's mother, his other relatives, his friends, or his girlfriend to see if Kimbrough was somehow disordered in his thoughts at the time of the Collins murder. Mosman said that he did not do so because "[t]hey would have, in all probability, no information on that issue at all."
In rebuttal, the State called Dr. Sidney Merin, a psychologist specializing in clinical psychology and neuropsychology. Merin conducted a court-ordered neurological and psychological examination of Kimbrough. He also reviewed background materials relating to Kimbrough and the *977 criminal proceedings against him. Merin interviewed and tested Kimbrough for just over six hours. He administered an IQ test and testified that Kimbrough had a full scale IQ of eighty-one, which is in the low average range. Merin thought that Kimbrough had a learning disability and that his "fund of information" was low. Merin also administered other tests which placed Kimbrough in the lower end of the average range. Merin stated: "I would conclude that he's probably in the low average range overall."
Merin testified that tests performed on Kimbrough revealed a statistically significant elevation in the psychopathic deviate scale. As to the significance of this result, Merin stated:
What you're more likely to say is this represents a significant degree of real rebelliousness in the personality, a significant degree of superficiality, an inclination not to become deeply, emotionally involved with others, although on the surface they can appear very nice. They make a good first impression. And after you talk with them a while, you begin to see what they're saying doesn't fit together, doesn't seem to  it's not that it doesn't make sense, but it seems to be selfserving. Also found with people who have conflict with authority, who are manipulative, who are confidence people, who can act impulsively, who can defy the rules, who can be insensitive to the feelings of others, have a lot of difficulty with empathy. These are people who sometimes have a history of being under-achievers. Or, again, they may be impulsive, may have a tendency to blame their family for whatever occurs to them or blame other people for whatever occurs to them, although projection on this scale is not necessarily a prominent feature.
Merin testified that based on the results of all the tests he administered, he did not find that Kimbrough suffered from a serious emotional or mental disorder. However, he did find an Axis II, or behavioral disorder, and a general personality disorder with borderline and antisocial features. Merin also diagnosed a learning disability, which was due to Kimbrough's personality characteristics and not due to brain damage. As far as brain functioning, Merin said that he did not see any problems.
Merin testified that he would not have found any statutory mitigating circumstances in this case. As a single nonstatutory mitigator, Merin might have found a borderline personality disorder which had its underpinnings possibly in Kimbrough's unstable early childhood. He noted, "that's a rather mild non-statutory." Merin did not find any evidence that Kimbrough suffered from an extreme mental or emotional disturbance at the time of the crimes and did not find any evidence that Kimbrough's capacity to appreciate the criminality of his conduct at the time of the crime was substantially impaired.
Merin did not find evidence to support a conclusion that Kimbrough's developmental or emotional age was less than his chronological age. Merin also did not agree that Kimbrough qualifies for a borderline intellectual functioning diagnosis, stating:
Well, first of all, I don't agree with your definition of borderline because  I don't agree with it because he's got many areas where he's perfectly average. So I would not in any way  I would not in any way suggest that he has a borderline, whatever it was, diagnosis that you're referring to. And you asked which ones? Well, let's just take a look at it. I referred to them earlier. We can take a look at it again. Average vocabulary, average verbal abstraction *978 scores, average visual reasoning, average nonverbal comprehension skills and several of those are just a smidgin below average. So I would not in any way suggest that he's got that borderline intellectual deficit. If you're just gonna use a number  which doesn't really mean anything, any psychologist will tell you those IQ numbers don't mean anything, because next week it could change. What you look for are levels and the way it's distributed.

Trial Court's Findings
In its order denying Kimbrough's 3.850 motion, the court devoted eight pages to the resolution of Kimbrough's Ake claim and set forth its factual findings. The court agreed that Cashman misunderstood the significance of the psychopathic deviate scale but noted that Sims, who understood the scale, concurred with striking Mings. The court held that the decision not to call Mings and Berland was a reasonable trial tactic.
The court found that Kimbrough failed to establish that additional materials or preparation would have enabled Mings, Berland, or any other doctor to conduct a more thorough mental health evaluation or to provide mitigation testimony sufficient to outweigh any of the potential risks associated with their testimony.
As to the potential mitigation found by Mosman, the court noted that he did not conduct any independent testing and that there were no witnesses at the evidentiary hearing who could have presented direct evidence regarding these potential mitigators. The court further concluded that many of the mitigators cited by Mosman would have been given little or no weight.

A. APPLICABLE LAW

1. Standard of Review
Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the test espoused in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, the defendant must first show that counsel's performance was deficient, which requires a showing "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Second, the defendant must show that the deficient performance prejudiced the defense, which requires a showing "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. Absent both showings, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. In reviewing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. In determining whether counsel's performance amounted to ineffective assistance, an appellate court must conduct an independent review of the trial court's legal conclusions while giving deference to the trial court's factual findings. Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999).

2. Ineffective Assistance of Counsel
The United States Supreme Court held in Ake that where an indigent defendant demonstrates to the trial judge that his sanity at the time of the offense will be a significant factor at trial, the State must "assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Ake, 470 U.S. at 83, 105 S.Ct. 1087.
*979 In Ragsdale v. State, 798 So.2d 713 (Fla.2001), this Court noted that "[a]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." 798 So.2d at 716 (quoting State v. Riechmann, 777 So.2d 342, 350 (Fla.2000)). The record in Ragsdale established that "counsel essentially rendered no assistance to Ragsdale during the penalty phase of trial." Ragsdale, 798 So.2d at 716. The Court stated that "[t]he record at the 3.850 evidentiary hearing conclusively establishes that counsel failed to investigate and present at the penalty phase an abundance of potential mitigating evidence." Id. At the evidentiary hearing, Ragsdale presented the live testimony of three siblings and the deposition testimony of two other siblings who testified as to Ragsdale's extensive history of abuse during his childhood. Id. The court stated:
Dr. Berland [the defense psychologist] concluded that Ragsdale was psychotic at the time of the offense, and thus the statutory mitigating circumstances of extreme mental or emotional disturbance and inability to conform to the requirements of law applied in the instant case. Dr. Berland also identified a list of nonstatutory mitigating factors including organic brain damage, physical and emotional child abuse, history of alcohol and drug abuse, marginal intelligence, depression, and a developmental learning disability.
Id. at 718. Although the State's expert witness did not agree that Ragsdale was psychotic and had suffered organic brain damage, he offered no opinion as to the applicability of the statutory mental mitigators. The State's witness admitted that Ragsdale had a severe learning disability, that Ragsdale's IQ score was in the borderline retarded range, that Ragsdale's brain was impaired, and that Ragsdale had a personality disorder with paranoid features. Id. On this basis, the Court held that "the conclusion is inescapable that there was available evidence from experts which would have supported substantial mitigation but which was not presented during the penalty phase." Id.
The Court distinguished Ragsdale from Cherry v. State, 781 So.2d 1040 (Fla.2000), and Asay v. State, 769 So.2d 974, 988 (Fla.2000). In Cherry, the Court denied an ineffective assistance of counsel claim because Cherry was uncooperative and precluded his counsel from investigating and presenting evidence in mitigation. In Asay, the Court affirmed the rejection of an ineffectiveness claim where the attorney was informed of the defendant's abusive background and, after contacting potential witnesses, made a strategic decision to forego the presentation of nonstatutory mitigation to avoid "open [ing] the door to damaging cross-examination regarding [defendant's] violent past." Asay, 769 So.2d at 988. The Court held that "defendant's attorney was not deficient where after receiving an initial unfavorable report from the examining psychologist the attorney decided to discontinue his investigation for mental mitigation evidence." Id. at 986; see also Jones v. State, 732 So.2d 313, 320 n. 5 (Fla.1999) (affirming trial court's finding that counsel had made reasonable tactical decision to forego further investigation of mental health mitigation evidence after receiving initial unfavorable diagnosis); Correll v. Dugger, 558 So.2d 422, 426 (Fla.1990) (a mental health examination is not inadequate simply because a defendant is later able to find experts to testify favorably based on similar evidence).

B. APPLICATION OF LAW
Kimbrough asserted that defense counsel was ineffective for failing to call Mings and Berland, for failing to provide Mings *980 and Berland with sufficient background information, and for failing to present statutory and nonstatutory mitigating evidence. Although this Court conducts an independent review on questions of law, it must give deference to the trial court's factual findings.

1. Failure to call Dr. Mings or Dr. Berland
The court found that there was insufficient testimony presented at the evidentiary hearing to establish either deficient performance or prejudice on the part of defense counsel for failing to call Mings or Berland at trial. The court found that Cashman's repeated references to the "psychopathic deviant" scale suggest that she did not fully appreciate the significance of the MMPI results and may have thought the evidence was more harmful than it actually was. However, the court noted that Cashman's cocounsel, Kelly Sims, understood the meaning of the scale and stated that he also would not have presented the evidence.
Cashman stated that there were mental health issues which could have been presented as mitigation but asserted that Berland would have found them difficult to present, and Cashman was concerned that the State would portray Kimbrough as someone who was faking mental illness. Sims was also concerned that Mings would testify that Kimbrough had no morals and would do whatever he wanted to do. He agreed that the defense could not risk opening the door to the introduction of a lot of bad information just to get in a small amount of helpful information.
Testimony at the evidentiary hearing corroborated Cashman's concern that Ashton would have used the MMPI results to portray Kimbrough in a bad light. The court concluded that counsel's decision not to call Dr. Mings or Dr. Berland as witnesses was a reasonable trial tactic. We agree with the trial court. Cashman and Sims weighed the mitigation evidence Mings and Berland could have presented against the potential risks of having them testify. The strategic decision Cashman and Sims made not to have Mings and Berland testify at trial was a reasonable trial tactic and did not constitute deficient performance. See Griffin v. State, 866 So.2d 1, 9 (Fla.2003) (citing Ferguson v. State, 593 So.2d 508 (Fla.1992), and State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987) (holding that "[s]trategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected")).

2. Failure to Provide Doctors With Sufficient Background Material
Kimbrough alleged that Mings and Berland were not provided sufficient background material to conduct a thorough mental health evaluation. The court held that the supporting facts required for an ineffective assistance of counsel claim in this respect are glaringly absent. No witnesses at trial could recall exactly what records were provided to, or withheld from, the defense experts.[9] Kimbrough did not establish that additional materials or preparation would have enabled Mings or Berland to conduct a more thorough *981 mental health evaluation. The court held that Kimbrough failed to meet his burden of proof.
We agree with the trial court's denial of relief on this claim. To establish deficient performance, Kimbrough must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Kimbrough failed to meet his burden of proof in this case.

3. Other Mitigation Evidence
Dr. Mosman asserted at the evidentiary hearing that there were numerous statutory and nonstatutory mitigators which should have been presented at trial. The court noted that Mosman did not conduct any independent testing of Kimbrough and that there was no evidence presented to support the existence of the proposed mitigators or to establish the weight they would have carried if presented to the jury during the penalty phase. The court also concluded that many of the mitigators cited by Mosman would have been given little or no weight. On this basis, the court held that Kimbrough failed to meet his burden of proof.
In support of his argument, Kimbrough cites Ragsdale. In Ragsdale, this Court held that counsel was ineffective when counsel presented no mitigation at the penalty phase, and the existence of an abundance of mitigators was undeniably shown at the evidentiary hearing. In this case, the mitigators presented by Mosman were based on speculation and conjecture and were rebutted by the State's expert witness. Additionally, the mitigators would have been given little or no weight by the court. The facts of this case are more similar to those in Asay where the Court affirmed the rejection of an ineffectiveness claim where defense counsel made a strategic decision to forego the presentation of nonstatutory mitigation to avoid opening the door to damaging cross-examination regarding the defendant's violent past. Asay, 769 So.2d at 988. The Court held that the "defendant's attorney was not deficient where after receiving an initial unfavorable report from the examining psychologist the attorney decided to discontinue his investigation for mental mitigation evidence." Ragsdale, 798 So.2d at 719. It is clear from the evidentiary hearing testimony in this case that mental health mitigation was investigated and counsel made a strategic decision not to present the mitigation. Counsel's actions in this case were not deficient, and Kimbrough's claims are without merit.

II. SUMMARY DENIAL OF CLAIMS
Kimbrough argues that the trial court erred when it denied an evidentiary hearing on five of the claims in his rule 3.850 motion. The State argues that the court properly denied the claims without a hearing.

A. APPLICABLE LAW

1. Standard of Review
This Court has repeatedly stated the standard of review for summary denial of a rule 3.850 claim:
To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or conclusively refuted by the record. Further, where no evidentiary hearing is held below, we must accept the defendant's factual allegations to the extent they are not refuted by the record.
Peede v. State, 748 So.2d 253, 257 (Fla.1999) (citation omitted). A movant is entitled to an evidentiary hearing on a claim of ineffective assistance of counsel if he or she alleges specific "facts which are not conclusively rebutted by the record and *982 which demonstrate a deficiency in performance that prejudiced the defendant." Gaskin v. State, 737 So.2d 509, 516 (Fla.1999) (quoting Roberts v. State, 568 So.2d 1255, 1259 (Fla.1990)).

B. APPLICATION OF LAW

1. Claim Two
Kimbrough alleged he was denied the effective assistance of counsel when counsel failed to adequately challenge the credentials of Charles Badger, a Florida Department of Law Enforcement (FDLE) employee and expert witness for the State. At trial, the defense declined to voir dire Badger stating, "We're familiar with Mr. Badger." Kimbrough argues that without an evidentiary hearing he was unable to inquire as to counsel's reasons for not conducting voir dire as to Badger's credentials. The State argued that Kimbrough failed to show how the decision not to voir dire the witness actually prejudiced Kimbrough because he did not allege that Badger was actually unqualified or that any specific damaging facts could have been revealed through further questioning.
The trial court stated that Kimbrough's allegations were conclusory and that Kimbrough failed to demonstrate what questions counsel should have asked or how those questions would have impeached Badger's credibility. The court held that Kimbrough failed to demonstrate either deficient performance or prejudice. The record in this case shows that Badger held a bachelor's degree, had been trained as a forensic serologist, and had been qualified to testify in Florida courts "twelve or thirteen times." There is no basis in the record for alleging that counsel's decision not to voir dire Badger constituted deficient performance. Kimbrough has failed to allege specific facts which are not conclusively rebutted by the record and which demonstrate a deficiency in performance that prejudiced the defendant. See Gaskin v. State, 737 So.2d 509, 516 (Fla.1999). Summary denial of this claim was proper.

2. Claim Four
Kimbrough alleged that his right to a jury composed of a cross-section of the community was violated by counsel's ineffectiveness during voir dire when counsel failed to rehabilitate Mattie Barnwell, one of the few African-Americans on the venire panel. Barnwell stated that she would do away with the death penalty and, although she understood it was part of the law in Florida, she would not be able to go along with the law and swear to follow it. Additionally, Kimbrough alleged that counsel failed to correct the state attorney's inaccurate statement that the juror would have to "take an oath swearing before God to follow the law of Florida," when in fact jurors may either swear or affirm. Kimbrough asserts that without an evidentiary hearing he was unable to inquire as to counsel's reasons for not conducting voir dire as to this juror in an effort to rehabilitate her.
The court noted that the standard for determining whether a prospective juror may be excused for cause because of his or her views on the death penalty is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The court also noted that Kimbrough did not offer in his 3.850 motion any specific questions that could have been asked to rehabilitate the juror, and it was unlikely any attempt to do so would have been successful.
Based on the statements made by Barnwell, it is clear that any attempt at rehabilitation would have failed. Counsel's performance was not deficient and summary *983 denial was proper. See Gaskin v. State, 737 So.2d 509, 516 (Fla.1999); see also Reaves v. State, 826 So.2d 932 (Fla.2002)(affirming summary denial of ineffective assistance claims where no challenge for cause would have been successful for named jurors and where claims that followup questions would have revealed a basis for cause challenges constituted mere conjecture).

3. Claims Six and Eighteen
Kimbrough alleged that counsel was ineffective (1) when, during voir dire, counsel failed to discover a juror's connection with the FDLE; and (2) when defense counsel failed to move for a mistrial after the State disclosed that the juror, Eddie Julian, had a connection with an FDLE employee. Julian's fiance worked in the FDLE crime lab, and Julian had taken courses in DNA. The State argued that these factors do not establish a reasonable probability that the outcome of the trial would have been different if these facts had been brought out on voir dire. At trial, defense counsel filed a motion for new trial and a motion to voir dire Julian. After a detailed hearing conducted August 8, 1994, at which Julian was thoroughly examined, the court denied the motion for new trial.
As the postconviction court stated, "The underlying substance of this claim is clearly Mr. Julian's potential bias, an issue which could have been raised on direct appeal because it was thoroughly addressed at the conclusion of the trial." On this basis, the court rejected the claim as procedurally barred, finding that it could have been raised on direct appeal. To the extent Kimbrough seeks review of the substantive issue underlying his ineffective assistance of counsel claim, we agree. See Maharaj v. State, 684 So.2d 726 (Fla.1996) (holding that postconviction relief claims which either were raised or could have been raised on direct appeal were properly denied without an evidentiary hearing); see also Sireci v. State, 469 So.2d 119, 120 (Fla.1985) ("Claims previously raised on direct appeal will not be heard on a motion for post-conviction relief simply because those claims are raised under the guise of ineffective assistance of counsel."). As to Kimbrough's claim that counsel was ineffective, Kimbrough has failed to establish prejudice. Thus, summary denial was proper. See Gaskin v. State, 737 So.2d 509, 516 (Fla.1999).

4. Claim Seven
Kimbrough alleged that counsel was ineffective when counsel failed to move for a mistrial after the State made three improper closing arguments which implied that Kimbrough should have presented certain evidence but failed to do so. At trial, defense counsel objected to each of the three arguments, and the court sustained each objection. The court admonished the prosecutor after the second comment and objection, stating: "You have a tendency to make it like they've got a responsibility here. They don't and that's mistrial material. Don't do it." The court gave two curative instructions during closing argument to inform the jury that the defense was not required to put on evidence. After the jury was excused to deliberate, the court asked Kimbrough if he wanted to request a mistrial. Kimbrough stated that he had spoken with his counsel and agreed that it would not be a good idea to request a mistrial. Kimbrough asserts that without an evidentiary hearing he was unable to inquire as to counsel's reasons for not requesting a mistrial.
In Spencer v. State, 645 So.2d 377, 383 (Fla.1994), this Court stated:
In order for the prosecutor's comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute *984 to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.
The court in this case found that the curative instructions were sufficient to correct any misconception in the minds of the jurors, and further found that the comments were simply not prejudicial enough to warrant a mistrial. The court held that counsel's obligations were fulfilled by raising timely objections, and if a new trial had been granted, there is no reasonable probability that the outcome would have been different. Defense counsel timely objected in this case, and the court gave two curative instructions. Counsel then discussed with Kimbrough whether or not he wanted to request a mistrial, and Kimbrough stated that he did not want to request a mistrial. Kimbrough has failed to allege specific "facts which are not conclusively rebutted by the record and which demonstrate a deficiency in performance that prejudiced the defendant." Gaskin v. State, 737 So.2d 509, 516 (Fla.1999). Summary denial was proper.

III. HABEAS CORPUS CLAIMS
Kimbrough raises two claims in his petition for habeas corpus. He first argues that Florida's death sentencing statutes as applied are unconstitutional pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has previously declined to hold that Florida's death penalty scheme is unconstitutional on the basis of Apprendi or Ring. See Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002).
Additionally, one of the aggravators in this case was a prior conviction for "burglary of a dwelling with a battery therein" and sexual battery. The prior violent felony aggravator alone clearly satisfies the mandates of the United States and Florida Constitutions. See Doorbal v. State, 837 So.2d 940 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). This claim is without merit.
Kimbrough next argues that his Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at the time of execution. Kimbrough notes that although a claim of incompetency to be executed cannot be asserted until a death warrant has been issued, federal law requires that, in order to preserve a competency to be executed claim, the claim must be raised in the initial petition for habeas corpus.
Under Florida Rules of Criminal Procedure 3.811 and 3.812, the issue of competency for execution cannot be raised until the Governor has issued a death warrant. See, e.g., Cole v. State, 841 So.2d 409, 430 (Fla.2003); Brown v. Moore, 800 So.2d 223, 224 (Fla.2001). Kimbrough asserts that he raises this claim to preserve his ability to pursue a similar claim in the federal system. Kimbrough's concession that this issue is not yet ripe is accurate. Accordingly, this claim is without merit.

CONCLUSION
For the reasons stated above, we affirm the lower court's denial of Kimbrough's rule 3.850 motion and deny Kimbrough's petition for a writ of habeas corpus.
It is so ordered.
*985 WELLS, PARIENTE, LEWIS, QUINCE, CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion.
CANTERO, J., concurs specially with an opinion, in which WELLS and BELL, JJ., concur.
ANSTEAD, C.J., specially concurring.
I concur in the majority opinion in all respects except for its discussion of the decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
CANTERO, J., specially concurring.
I concur in the majority opinion. Moreover, regarding Kimbrough's claim that Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), I also would hold, for the reasons stated in my specially concurring opinion in Windom v. State, 886 So.2d 915, 935-52, 2004 WL 1057640 (Fla. May 6, 2004), that Ring does not apply retroactively.
WELLS and BELL, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
[2] In this amended motion, Kimbrough alleged that: (1) he was denied the right to fully investigate and prepare his postconviction pleadings because the court required that the motion be filed before the results of DNA testing were concluded; (2) counsel was ineffective for failing to adequately challenge the credentials of state expert witness Charles Badger; (3) counsel was ineffective for failing to request an inquiry as to the general scientific acceptance of the DNA technique employed at trial; (4) Kimbrough's right to a jury composed of a cross-section of the community was violated by counsel's failure to rehabilitate venireperson Mattie Barnwell; (5) counsel was ineffective for failing to voir dire juror Louisa Devose regarding her connection to the crime scene; (6) counsel was ineffective for failing to discover during voir dire juror Eddie Julian's connection with the Florida Department of Law Enforcement; (7) counsel was ineffective for failing to move for a mistrial after the State's improper closing argument; (8) Florida's capital sentencing statute is unconstitutional on its face and as applied; (9) Kimbrough was denied his right to a fair and impartial jury by prejudicial pretrial publicity, by the lack of a change of venue, by a failure to sequester the jury, and by events in the courtroom during trial; (10) counsel was ineffective for allowing excessive security measures or shackling at trial to deprive Kimbrough of a fair trial; (11) execution by lethal injection constitutes cruel and unusual punishment; (12) execution by electrocution is cruel or unusual punishment; (13) Kimbrough's trial was fraught with procedural and substantive errors which denied him a fair trial; (14) the jury received inadequate guidance concerning the aggravating circumstances to be considered; (15) the penalty phase jury instructions were incorrect under Florida law, the sentence of death is unconstitutional, and counsel was ineffective for failing to object; (16) Kimbrough's sentence rests upon an unconstitutionally automatic aggravating circumstance; (17) counsel was ineffective for failing to object when the State overbroadly and vaguely argued aggravating circumstances; (18) counsel was ineffective for failing to move for a mistrial after the State disclosed that one of the jurors had a connection with a Florida Department of Law Enforcement employee; (19) Kimbrough was denied his right to adequate mental health assistance under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); and (20) counsel was ineffective for failing to adequately present available alibi witnesses.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] Claims one, three, and twenty.
[5] Claims five, ten, and nineteen.
[6] Although the note referred to "psychopathic deviant," the note apparently referred to a spike on the "psychopathic deviate scale," one of the scales in the MMPI. There was some evidence that Cashman confused the name of the scale with an actual diagnosis that Kimbrough was a psychopathic deviant.
[7] American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000).
[8] Between the time of the Collins murder and the time he was charged with the murder, Kimbrough committed another rape. He pled guilty to the rape charge.
[9] The court noted that Kimbrough, through the actions and inactions of collateral counsel, contributed to his inability to meet his burden of proof. The court stated:

Instead of immediately attempting to obtain statements and records from trial counsel and examining doctors only 5 years after the trial, when recollections would have been fresher and records less likely to be missing, CCRC [Capital Collateral Regional Counsel] engaged in one delay tactic after another. Although CCRC's dilatory conduct made its job more difficult, CCRC has exhausted every conceivable avenue of relief on Defendant's behalf.