[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 13 , 2009
THOMAS K. KAHN
CLERK

_____

No. 08-11421

_____

D.C. Docket No. 05-00265-CV-ACC-GJK

DARIUS MARK KIMBROUGH,

                                                    Petitioner-Appellant,

versus

SECRETARY, DOC,
FL ATTORNEY GENERAL,

                                                    Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 13, 2009)

Before: EDMONDSON, Chief Judge, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Darius Mark Kimbrough appeals the denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. We granted Kimbrough's request for a certificate of appealability on the issue of whether the Florida Supreme Court's determination – that it was a reasonable trial tactic for petitioner's trial counsel not to present mental health mitigation testimony and evidence at Kimbrough's penalty phase – is contrary to or an unreasonable application of clearly established United States Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d).

## I. Background

Kimbrough was convicted of first-degree murder, burglary of a dwelling with a battery therein, and sexual battery with great force. The facts pertinent to Kimbrough's crimes of conviction are recounted in the Florida Supreme Court's opinion on direct appeal. Kimbrough v. State, 700 So. 2d 634, 635-36 (Fla. 1997). The Florida Supreme Court summarized the trial court's penalty phase findings as follows:

> In the sentencing order, the judge listed three aggravators: prior violent felony, committed during the course of a felony, and heinous, atrocious, or cruel (HAC). To support the prior violent felony aggravator, the judge cited Kimbrough's prior convictions for both burglary of a dwelling with battery therein and sexual battery. The court found that the murder here was committed during sexual battery or attempt to commit sexual battery, citing DNA evidence and bruising, as well as evidence that the victim and defendant did not know each other. HAC was supported by the size of the victim, the three blows to her head causing fracture by blunt force, evidence of a

2

struggle (the room was in disarray), and the amount of blood found around the room.

The judge considered age as a statutory mitigator (Kimbrough was nineteen), but rejected it because there was no evidence establishing that he was immature or impaired. The court considered the following nonstatutory mitigation: Kimbrough had an unstable childhood, maternal deprivation, an alcoholic father, a dysfunctional family, and a talent for singing. The court found that the mitigation did not temper the aggravators.

Id. at 636.

Kimbrough was subsequently sentenced to death consistent with the jury's vote of eleven to one recommending imposition of the death penalty.[1]  Kimbrough unsuccessfully appealed his conviction and sentence of death to the Florida Supreme Court, id., and the United States Supreme Court denied certiorari, Kimbrough v. Florida, 523 U.S. 1028 (1998).

Kimbrough filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850, raising numerous claims regarding ineffective assistance of counsel, the constitutionality of Florida's death penalty, and the right to a fair and impartial jury.  See Kimbrough v. State, 886 So. 2d 965, 969 n.2. (Fla. 2004). The state trial court held a hearing pursuant to Huff v. State, 622 So. 2d 982 (Fla.

---

[1] A different jury was empaneled for Kimbrough's sentencing because three of the jurors from Kimbrough's guilt phase read newspaper articles about the case after the conclusion of the trial.

1993),[2] and granted an evidentiary hearing on three of Kimbrough's claims, including his claim that he received ineffective assistance of counsel to the extent that his trial counsel did not provide a competent mental health professional to evaluate him. Id. at 970. After the evidentiary hearing, the state trial court denied Kimbrough relief on all of his claims brought pursuant to Rule 3.850, which the Florida Supreme Court affirmed on appeal. Id. at 984. The Florida Supreme Court also denied Kimbrough's petition for a writ of habeas corpus. Id.

Kimbrough then filed the instant federal habeas corpus proceeding, which was denied in its entirety by the district court in Kimbrough v. Crosby, 2008 WL 544867 (M.D. Fla. Feb 26, 2008). We granted Kimbrough's renewed application for a certificate of appealability as to the issue of whether the Florida Supreme Court's determination that Kimbrough did not receive ineffective assistance of counsel because his trial counsel failed to present any mental health evidence in the penalty phase of his trial was contrary to or an unreasonable application of Supreme Court precedent.

## II. Standard of Review

Our review of Kimbrough's final state habeas petition is governed by the

---

[2] In Huff the Florida Supreme Court held that in state death penalty post-conviction proceedings, the court must allow the defendant's attorney the opportunity to appear before the court "for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion." 622 So. 2d at 983.

4

standards set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.  For any claim adjudicated on the merits in state court, § 2254(d) allows federal habeas relief only where the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Because the state court adjudicated Kimbrough's claim of ineffective assistance of counsel on the merits, we review whether that decision was "contrary to" or "an unreasonable application" of federal law.

A decision "contrary to" federal law contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts – in short, it is a decision "substantially different from the [Supreme Court's] relevant precedent . . . ."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A decision that unreasonably applies federal law identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, "unreasonably extends [the] principle . . . to a new context where it should not

5

apply, or unreasonably refuses to extend [it] to a new context where it should apply." Id. at 407.

## III. Discussion

In this habeas petition, Kimbrough challenges the Florida Supreme Court's conclusion that his trial counsel, Patricia Cashman and Kelly Sims, were not ineffective, but rather made a reasonable strategic decision when deciding not to present testimony from any mental health professional at the penalty phase of Kimbrough's trial. The Florida Supreme Court extensively described the testimony that was presented at Kimbrough's state post-conviction evidentiary hearing on this issue:

> Kimbrough was represented at trial by two attorneys, Patricia Cashman and Kelly Sims. Both Sims and Cashman are very experienced in capital cases. Cashman testified that Dr. Eric Mings, a forensic criminal psychologist, was retained to conduct a psychological evaluation of Kimbrough and was originally listed as a defense witness. On February 11, 1994, prior to trial, Cashman filed a notice striking Mings from the witness list. Mings was removed from the list quickly so that the State could not depose him. Although she could not recall all of the reasons she had for striking Mings from the witness list, she stated that one of the reasons she struck Mings was because of the things Mings said about Kimbrough being a "psychopathic deviant" and the fact that she thought such testimony would hurt him in front of the jury. Cashman testified that the decision not to call Mings was a joint decision, made by her and Sims, and stated that before making such a decision she would have asked Mings whether he thought he could be helpful as a witness.

> At the hearing, Cashman reviewed a note she wrote while preparing for

6

the Kimbrough trial. The note reflected that Kimbrough denied having any problems, had relatives in Tennessee, was raised by his stepfather, and had no history of abuse. The "worst thing that happened to him" was that his cousin was killed at the age of sixteen. Kimbrough won talent show trophies for singing and had an intelligence quotient (IQ) of seventy-six, which was in the fifth percentile on the Wechsler Adult Intelligence Scale test (WAIS). He had an MMPI (Minnesota Multiphasic Personality Inventory) which was valid, but defensive. The note also stated that there was a spike on "scale four, psychopathic deviant[3] endorsing items consistent with family discord, other scales normal." She did not recall what exactly Mings told her about the psychopathic deviate scale.

Cashman had defended a number of cases prosecuted by Jeff Ashton, the prosecutor in this case, and was familiar with him and his trial tactics. She stated that Ashton liked to use a spike on scale four of the MMPI "[t]o make my client look really dangerous and make the jury scared of him and want to kill him."

In addition to Mings, Cashman retained Dr. Robert Berland, a forensic psychologist, to conduct a pretrial evaluation of Kimbrough. Cashman apparently retained Berland in an attempt to find an expert who might be more favorable to Kimbrough for mental health mitigation purposes. Although Berland thought there were mental health issues which could have been presented at the penalty phase, he thought they would be difficult to present to the jury. Cashman chose not to put Berland on the stand because she thought he would testify that Kimbrough had "hidden craziness." She was concerned that the prosecution would portray Kimbrough as faking mental illness and noted that Berland's intelligence testing, which gave Kimbrough an IQ of ninety-four, placed him in the normal range of intelligence. Cashman was aware that the cutoff for mental retardation was seventy

---

[3] Cashman's use of the term 'psychopathic deviant' in the note was presumably a reference to a spike on the 'psychopathic deviate scale,' in the MMPI. The Florida State Court acknowledged that Cashman confused the name of the scale with an actual diagnosis that Kimbrough was a psychopathic deviant. Kimbrough, 886 So. 2d at 971 n.6.

and that seventy-six reflected a low IQ.

Cashman testified that she always ensured the mental health experts she retained had adequate background information on her clients. She recalled that Kimbrough's family members were not particularly cooperative in this case.

Kelly Sims, Cashman's cocounsel, was certain that he had telephone conversations with Mings prior to the time Cashman wrote the note that was found in Kimbrough's file. Sims stated that his practice at the time was not to write notes that could prove harmful to his client because he thought they could fall into the wrong hands. Although he said Cashman was better at taking notes than he was, "she was specifically never going to put anything down that may hurt her client." Sims explained any absence of notes from Cashman is evidence "that something bad happened because she is a prolific note-taker." He did not recall any specific reasons for striking Mings from the witness list but said, "[I] know we must have talked about it and I was in agreement with it." Sims further stated that if he had thought striking Mings was a mistake, he would have relisted him.

Sims testified that he thought Berland was retained as a second opinion to try to develop some mental health issues. He did not recall whether retaining Berland was his idea or Cashman's. Sims testified that there was nothing in the public defender file that would tell him why Berland was not used but stated that the decision would have been made based on what Berland was going to testify to at trial.

With regard to waiving potential mental health mitigation, Sims testified that while others may have had input on the decision, ultimately it was his choice and his decision. He did not remember discussing with Kimbrough the decision not to present mental health mitigation. Sims testified that he did not want any record discussion of the issue and said, "I just did not want to bury any hope for Mark Kimbrough later down the line. And I think that's what Ashton was trying to do. And that's not my job to help clean up the State's case." Sims stated: "I know that in my relationship with Mr. Kimbrough I had laid out everything that we did and talked about the pros and cons of it

and thought I would make some coherent cohesive argument about why we had to do A, B, or C and spent hours talking about it." But, Sims thought he did not have a very good level of communication with Kimbrough. When asked about the theme of any mitigation defense, Sims stated:

I recall that the theme was thread bare, that the main theme was that it didn't seem Mark had all that high of an IQ with respect to just dealing with figuring out problems in his life.

It seemed like he had a lot of people that loved him and a lot of family that embraced him and that kind of can be contra to finding good mitigation going because people were kind of, I mean, his family wanted him and wanted to help him and I guess there was a little bit of, back when he was a teen, I can recall that some of the family members saying we wanted him to live with us and they said, no, we want him to live with us.

I know he was a skilled singer.

He had gifts to share in that field.

But as far as being able to show physical abuse or sexual abuse and some kind of brain injury or organic brain dysfunction, I don't recall us having any of that.

Sims thought that a low IQ was a potential mitigator but noted that there are plenty of inmates on death row who have been found to have IQs similar to Kimbrough's. Moreover, Sims stated that part of his argument during the guilt phase was that Kimbrough would have been really dumb to rape and murder a girl in his own apartment complex, to let another person see him with a ladder, and to then watch the next morning while all of the crime scene investigators and detectives were there. Sims worried that if they presented the low IQ evidence, it might have led the jury to think, "Well, he might be a dope, so he would do something that would [make it] easy to catch him."

The State called Jeffrey Ashton, the prosecutor at Kimbrough's trial. Ashton was familiar with Cashman and Sims. Ashton testified that an elevation on scale four, psychopathic deviate, was the one he hoped for on an MMPI. He stated: "It is the one which, just by its name, is most appealing to a prosecutor. Because, when you can argue to a jury that this man has a high psychopathic deviant [sic] scale, just those words alone are a wonderful argument for a jury." The words alone have a negative connotation. Ashton further stated:

> [M]y experience generally is that when you ask for a definition of what does psychopathic mean, the definition you get is one of someone, you know, who lacks a well-developed conscience, you know, does not feel remorse, guilt, things of that general way. So it's something that it's hard to spin that as positive or sympathetic in my experience.

Ashton stated that if he had known a scale four would come up, he would have used experts to characterize Kimbrough as dangerous. He would have gone into the characteristics of psychopathy, would have quoted some of the "less favorable descriptions of psychopaths," and would have equated psychopathy to antisocial personality disorder. He also stated he would have questioned expert witnesses about their knowledge of Kimbrough's prior criminal acts, both charged and uncharged, and would have asked about previous known acts of violence.

As to a potential "remorse" mitigator, Ashton testified that "[e]xpressions of remorse, when you're in jail, after you've been caught and convicted, you know, are risk for argument of the insincerity of the supposed remorse." He further noted that the remorse argument opens the door to testimony as to the actions or conduct of the defendant that are inconsistent with remorse. Questions of character and the like generally open the door to questions about the full range of the defendant's possible misconduct. In this case, it might have opened the door for evidence that Kimbrough had previously

been involved in a gang fight.

. . .

Testimony of Mental Health Experts[4]

Mings testified that a spike on scale four, psychopathic deviate, is not a formal DSM diagnosis. He could not recall diagnosing Kimbrough with antisocial personality disorder, but it was possible that he discussed antisocial personality with Cashman as a possible diagnosis for Kimbrough. He stated that scale four of the MMPI measures traits which are found in persons with antisocial personality disorder but noted that such traits can also be found in normal people. Mings spent about eight hours with Kimbrough in testing and then another seven hours or so scoring the tests, reviewing background materials, and talking to attorneys. He requested an additional five hours for background material, and while he had no clear recollection, his impression was that he did not get much from Kimbrough and wanted to talk to other people to find out more details.

Dr. Bill Mosman, a forensic psychologist and practicing attorney from the Miami, Florida, area, testified regarding potential statutory and nonstatutory mitigators which were not introduced at trial. Mosman reviewed various materials provided by Berland, reviewed the work of Dr. Sidney Merin, the State's mental health expert, reviewed the sentencing transcript, reviewed school records, and had conversations with Berland. Mosman did not personally examine Kimbrough prior to testifying and did not administer any tests to Kimbrough. He reviewed the defense investigator's file and recognized that Pizarroz "did voluminous amounts of work." From his review of the materials, Mosman thought that "from a statutory point of view, there were 5 statutory mitigators that were available and well reasonably could have been argued. From a hyper technical point of view there were three, but two of those are disjunctive." As to the potential statutory mitigators, Mosman stated:

---

[4] The testimony of these experts was presented at the state post-conviction evidentiary hearing.

11

They are a felony was committed while under the influence of extreme mental disturbance, felony committed while under the influence of extreme emotional disturbance, and mental is different than emotionally, capacity to appreciate the criminality of his conduct was substantially impaired, capacity to conform his conduct to the requirements of law was substantially impaired.

Age of the defendant at the time of the crime clearly, clearly, multiple severe impairments in that area, these are the statutory ones.

Mosman testified that his review of the record and applicable case law revealed some thirty nonstatutory mitigators that could have been argued to the jury.

. . .

In rebuttal, the State called Dr. Sidney Merin, a psychologist specializing in clinical psychology and neuropsychology. Merin conducted a court-ordered neurological and psychological examination of Kimbrough. He also reviewed background materials relating to Kimbrough and the criminal proceedings against him. Merin interviewed and tested Kimbrough for just over six hours. He administered an IQ test and testified that Kimbrough had a full scale IQ of eighty-one, which is in the low average range. Merin thought that Kimbrough had a learning disability and that his "fund of information" was low. Merin also administered other tests which placed Kimbrough in the lower end of the average range. Merin stated: "I would conclude that he's probably in the low average range overall."

Merin testified that tests performed on Kimbrough revealed a statistically significant elevation in the psychopathic deviate scale. As to the significance of this result, Merin stated:

What you're more likely to say is this represents a significant degree of real rebelliousness in the personality, a significant degree of superficiality, an inclination not to

12

become deeply, emotionally involved with others, although on the surface they can appear very nice. They make a good first impression. And after you talk with them a while, you begin to see what they're saying doesn't fit together, doesn't seem to-it's not that it doesn't make sense, but it seems to be selfserving. Also found with people who have conflict with authority, who are manipulative, who are confidence people, who can act impulsively, who can defy the rules, who can be insensitive to the feelings of others, have a lot of difficulty with empathy. These are people who sometimes have a history of being under-achievers. Or, again, they may be impulsive, may have a tendency to blame their family for whatever occurs to them or blame other people for whatever occurs to them, although projection on this scale is not necessarily a prominent feature.

Merin testified that based on the results of all the tests he administered, he did not find that Kimbrough suffered from a serious emotional or mental disorder. . . .

Merin testified that he would not have found any statutory mitigating circumstances in this case. As a single nonstatutory mitigator, Merin might have found a borderline personality disorder which had its underpinnings possibly in Kimbrough's unstable early childhood. He noted, "that's a rather mild non-statutory." Merin did not find any evidence that Kimbrough suffered from an extreme mental or emotional disturbance at the time of the crimes and did not find any evidence that Kimbrough's capacity to appreciate the criminality of his conduct at the time of the crime was substantially impaired.
. . .

Kimbrough, 886 So. 2d at 969-978. (original footnotes omitted).

Based on its review of the evidence presented at the Rule 3.850 post-

conviction hearing, the Florida Supreme Court agreed with the trial court that

13

Cashman and Sims's decision not to present any testimony from Dr. Mings or Dr. Berland during the penalty phase was a reasonable trial tactic. Id. at 980. In addition, the Florida Supreme Court concluded that Kimbrough failed to meet his burden in showing that his trial counsel did not provide sufficient background material to Dr. Mings and Dr. Berland. Id. at 981. Nor did Kimbrough meet his burden in presenting evidence to support the existence of possible mitigation evidence suggested by Kimbrough's expert, Dr. Mosman. Id.

Ineffective assistance of counsel claims are governed by the standard set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland, 466 U.S. at 687). A defendant has the burden of establishing deficient performance by showing that "counsel's representation 'fell below an objective standard of reasonableness.'" Id. (quoting Strickland, 466 U.S. at 688). The Supreme Court has not articulated specific guidelines for appropriate attorney conduct, but rather instructs that the standard is one of "reasonableness under prevailing professional norms." Id. As to claims of ineffective assistance of counsel at the penalty phase of the trial, "we consider whether counsel reasonably investigated possible mitigating

14

factors and made a reasonable effort to present mitigating evidence to the sentencing court." Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006).

We have previously explained that a state court's determination that a decision of counsel is "tactical" is a question of fact that we review under a clear and convincing evidence standard. Gaskin v. Sec'y, Dept. of Corrections, 494 F.3d 997, 1003 (11th Cir. 2007). Moreover, the decision that counsel's tactical decision was reasonable, as the Florida Supreme Court concluded in this case, is a question of law we review de novo. Lawhorn v. Allen, 519 F.3d 1272, 1295 (11th Cir. 2008).

After thorough review of the Florida Supreme Court's decision and the evidentiary record in this case, we cannot say that it was contrary to or an unreasonable application of Supreme Court precedent for the Florida Supreme Court to conclude that Kimbrough's trial counsel made a reasonable strategic decision when deciding not to present mental health evidence at the penalty phase of Kimbrough's trial. From what Sims and Cashman recalled, they specifically and deliberately chose not to have either Dr. Mings or Dr. Berland testify at Kimbrough's penalty phase out of a concern that the limited beneficial information they might have been able to present would have been outweighed by the risk of opening the door to the admission of more damaging information. Although

15

Cashman apparently misunderstood the significance of Dr. Mings's explanation of the psychopathic deviate scale as it related to Kimbrough, the state prosecutor confirmed that he would have used the spike on this scale to convince the jury that Kimbrough was dangerous. Cashman, who was familiar with the prosecutor at the time of the trial, testified she was concerned this would happen. Moreover, Sims testified that he did not recall that they had any evidence of physical or sexual abuse nor any evidence of brain injury or organic brain dysfunction that they could have presented. He also testified that the presentation of Kimbrough's low IQ in mitigation would have been counterproductive to his guilt phase argument that Kimbrough did not commit the crime because he would have been "really dumb" to rape and murder someone in his own apartment complex and then stand around the next day watching when law enforcement officials investigated the crime scene. See e.g., Stevens v. Zant, 968 F.2d 1076, 1083 (11th Cir. 1992) (concluding that trial counsel was not unreasonable in deciding not to present mental health testimony at sentencing where counsel believed the potential harm from cross-examination outweighed any benefits of the expert's testimony). Because Kimbrough has not shown that his trial counsel's performance was deficient, we need not address whether such performance prejudiced him.

Accordingly, we find no error in the district court's dismissal of Kimbrough's

16

petition for a writ of habeas corpus.

**AFFIRMED**.