[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15053

_____

D.C. Docket No. 4:09-cv-00054-RH-CAS

HARRY JONES,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(August 25, 2016)

Before ED CARNES, Chief Judge, and HULL and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, Harry Jones was convicted of first-degree murder,

robbery, and grand theft of a motor vehicle in Florida state court and sentenced to

death.  He appeals the district court's denial of his federal petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  Two claims are certified to us.  For

starters, Jones argues that his trial counsel was ineffective for failing to fully

investigate and present mental-health mitigation evidence during the penalty phase

of his trial.  He also claims his trial counsel was ineffective for failing to

contemporaneously object when he was shackled in view of the venire panel

during jury selection and that the district court abused its discretion by denying

him an evidentiary hearing on this claim.  After thorough review and having had

the benefit of oral argument, we conclude that he's entitled to no relief on either

claim and affirm the judgment of the district court.

## I.

### A.  The Murder and Jones's Trial

The basic facts of the murder, as summarized by the Florida Supreme Court

in Jones's direct appeal, are these.[1]  On June 1, 1991, sometime between 6:30 and

7:00 p.m., Jones and his friend, Timothy Hollis, entered a liquor store in

Tallahassee, where the victim, George Wilson Young, Jr., was talking with a store

employee.  Hollis was intoxicated, and, when he appeared to get sick, Jones took

him to the rest room.  When he returned from the rest room, Jones saw Young pay

for a half pint of gin from money Young had pulled from his pocket.  Young then

helped Jones take Hollis outside and agreed to give the two men a ride home.

---

[1] Jones v. State, 648 So. 2d 669, 672-73 (Fla. 1994).

2

Several witnesses saw the three men leave the liquor store in Young's red Ford Bronco II, a little before 7:00 p.m. Subsequently, Hollis's mother observed Jones and Young bring her son home in a red truck and then leave the house together. Sometime between 7:30 and 8:00 p.m., Young and Jones were seen by a clerk at a local convenience store, where they purchased a six pack of beer.

At approximately 8:05 p.m., Young's truck was involved in an accident on the north side of Tallahassee. Jones was the only occupant, and he was taken to the emergency room and admitted to the hospital. When authorities realized that the truck's owner was missing, a detective was sent to question Jones. Jones told the detective that he had borrowed the truck from a black man in "Frenchtown" for 20 dollars. The next day, when authorities learned that Jones had been seen with Young prior to the accident, two officers went to question Jones again. While in Jones's hospital room, the officers seized a bag of clothing that had been placed in the corner of the room. The clothing had been removed from Jones by hospital personnel after the accident. The following day, law enforcement seized lottery tickets and cash that had been removed from Jones' pockets and placed in hospital security.

On June 6, 1991, Young's body was found in Boat Pond, on Horseshoe Plantation, to the east of where the accident occurred. Witnesses who found the body said they had previously seen Jones fishing in other ponds on the plantation.

3

Experts determined that soil and pollen samples taken from the clothing seized from Jones's hospital room were similar to samples taken from Boat Pond. Investigators also determined that the lottery tickets seized from hospital security had been purchased at the same time and place as tickets found in Young's truck.

The medical examiner determined that Young died as a result of fresh-water drowning. Although the medical examiner was unable to determine whether Young was conscious at the time he drowned, he was able to determine that Young was alive at the time he was submerged because of plant material that had become lodged in his lungs and throat. The medical examiner also determined that, among other injuries, Young suffered a fractured arm and several fractured ribs that were consistent with pre-mortem defensive injuries.

While he was detained pending trial, Jones confessed to fellow inmate, Kevin Prim, that he had met a "guy" at a liquor store. Jones told Prim that, after observing the guy pull money from his pocket to pay for his purchase, he talked the guy into giving him and his intoxicated "cousin" a ride home. After dropping the cousin off, Jones and the guy went to a pond where a struggle ensued when Jones attempted to take the guy's money. Jones also admitted breaking the man's arm during the struggle and then holding him down in the water until he stopped "popping up." Another cellmate overheard Jones tell Prim that he had killed a man.

4

In July 1991, a grand jury sitting in Leon County, Florida, indicted Jones for first-degree murder, robbery, and grand theft of a motor vehicle. See id. at 672. Jones's first trial resulted in a hung jury and a mistrial. Id. His second trial, presided over by Circuit Judge William L. Gary, lasted a total of five days. Jury selection commenced at 9:00 a.m. on Monday, November 9, 1992. The jury was chosen by 4:20 p.m. that day. The guilt phase commenced the following day. By about 4:00 p.m. on Friday afternoon, the jury rendered its verdict, finding Jones guilty as charged.

After a 15-minute break, the court continued with the penalty phase. The state relied on the evidence presented during the guilt phase and also introduced records of Jones's prior convictions for attempted robbery, in 1977; robbery, in 1982; two counts of robbery with a firearm, also in 1982; and one count each of robbery with a firearm and kidnapping, in 1984.

In mitigation, Jones offered testimony from his older sister, Betty Jones Stewart, who was a Metro-Dade police officer. Stewart averred that, when she and Jones were young, their father was abusive toward their mother. Jones, who was "very young and . . . didn't understand," was very attached to their father. When Jones was about five years old, their father left and never came back. Afterwards, Jones "had a very hard time dealing with the fact that he didn't have a father." Their mother later remarried, but that relationship was abusive, too. One night,

5

when their stepfather became especially abusive, their mother stabbed and killed him.  Their mother was incarcerated for the homicide for about three years.  Jones was about 12 years old at the time.  Stewart, then 16, and her older sister, who was 18, basically raised Jones from that point on, with some help from an aunt and their older brother, who was 19 or 20.  Stewart explained that, after their mother went to prison, Jones "just became a different person."  "He wasn't controllable."  Stewart got a job, and the family was able to stay together and avoid foster homes.  But, "[Jones] never adjusted to it and he just started to rebel and get in trouble at that point."

Jones testified on his own behalf about his relationship with his father as a child, and about the day his father left.  Jones also testified about how he had been drinking continuously the night before Young's homicide and throughout that day.  He told the jury that, after his car accident on the night of the homicide, he was taken to the hospital where his blood alcohol level was determined to be 0.269, more than two-and-a-half times the then-legal limit of 0.1.

The jurors began deliberating at 6:10 p.m.  At 7:35 p.m., they returned with a recommendation for the death penalty, by a vote of ten to two.

At the sentencing hearing, the trial judge found three statutory aggravating circumstances, including that (1) Jones was previously convicted of another violent felony, Fla. Stat. § 921.141(5)(b) (1991); (2) the murder was committed while

Jones was engaged in the commission of a robbery, id., § 921.141(5)(d); and (3) the murder was especially heinous, atrocious, or cruel, id., § 921.141(5)(h). Jones, 648 So. 2d at 673. In mitigation, the trial judge also found that (1) as a statutory mitigator, Jones's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, Fla. Stat. § 921.141(6)(f) (1991); and, as non-statutory mitigating circumstances, (2) Jones suffered from a traumatic and difficult childhood, and (3) he had the love and support of his family. Jones, 648 So. 2d at 673. The trial judge determined that the aggravators outweighed the mitigators, and, following the jury's recommendation, he imposed the death penalty. See id.

## B.  Direct Appeal

Jones appealed his convictions and death sentence on several grounds; none raised a shackling claim. See id. n.4. The Florida Supreme Court affirmed the judgment in an opinion issued in November 1994, id. at 680, and the United States Supreme Court denied certiorari, Jones v. Florida, 515 U.S. 1147 (1995).

## C.  Rule 3.850 Proceedings

In March 1997, Jones, represented by new counsel, began a series of collateral attacks, first by filing in state court a motion to vacate his convictions and death sentence, pursuant to Fla. R. Crim. P. 3.850. The motion raised eight claims; none alleged that Jones had been shackled during his trial. Through

counsel, Jones then filed an amended motion in March 2003 -- more than 10 years after his trial had concluded. This time, Jones claimed, among other things, that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, by failing to investigate and present available mental-health evidence in mitigation during the penalty phase. He also claimed -- for the first time -- that he was unconstitutionally shackled during the trial and his counsel was aware of the shackling, yet failed to object, again in violation of the Sixth Amendment. More specifically, Jones alleged:

> Mr. Jones was shackled in view of the jury at his capital trial. During voir dire, Mr. Jones was shackled in front of the venire. Members of the venire, from which the ultimate jury panel was selected, had a full view of the shackles which were placed on Mr. Jones.

Jones argued that the shackling "rendered his trial fundamentally unfair," that his "trial and penalty phase were prejudiced," and, therefore, that "he [was] entitled to a new trial and/or new penalty phase" based on the Fourteenth Amendment's Due Process Clause. Jones also claimed that "[t]o the extent trial counsel did not properly preserve [the] claim, Mr. Jones received ineffective assistance of counsel."

In January 2004, pursuant to Huff v. State, 622 So. 2d 982, 983 (Fla. 1993),[2] the trial court, presided over by the same judge, conducted a hearing on the amended Rule 3.850 motion to determine which of the claims required an evidentiary hearing. The state court ultimately granted Jones an evidentiary hearing on his claim that trial counsel was ineffective for failing to uncover and present mental-health mitigation evidence at the penalty phase. But, the court denied Jones an evidentiary hearing on his shackling claim, after having the following discussion with defense counsel:

| Court: | How about [claim] seven? That's the claim that you are saying he was shackled during the trial. |
|---|---|
| Defense counsel: | Yes, Your Honor. Claim seven, the shackling claim, I do think that necessitates a hearing. |
| Court: | I do not think it necessitates a hearing because there was no shackles used during that entire trial. The record is void of anything relating to shackles, and the Court was there, and he was not shackled, period. |
| | Now, if the Supreme Court wants to reverse me on that and send it back for us to have a hearing where I'm going to make the finding he wasn't shackled, because he wasn't shackled, fine. But, I'm not giving you a hearing on that. You are wasting the Court's time. |
| Defense counsel: | I would just make -- I think it necessitates a hearing, Your Honor. |

---

[2] In Huff, the Florida Supreme Court held that due process requires that, in capital cases, trial courts must conduct a hearing on a prisoner's Rule 3.850 petition before adopting the state's proposed order denying relief. 622 So. 2d at 983.

9

Court:              I told you you are not having a hearing.

Defense counsel:    Yes, Your Honor.

Court:              And I find it almost offensive that even a claim
                    like that would be made when there was no
                    shackles used during that trial. The only time
                    Mr. Jones ever had shackles in the courtroom was
                    at pretrial matters. He was never in the presence
                    of a jury with shackles on, period.

At the evidentiary hearing on his mental-health mitigation claim, Jones

called his trial attorney, Gregory Cummings, who was appointed to represent Jones

on September 17, 1991. Prior to that time, the Public Defender's Office had

represented Jones, but that office had to withdraw because it was also representing

Kevin Prim, who would testify against Jones at trial. Cummings had in his case

file for Jones's case a memo that had been prepared on July 26, 1991, by Assistant

Public Defender Nancy Showalter. The memo documented Showalter's phone

conversation with Dr. Robert Berland, a forensic psychologist, who had

administered the Minnesota Multiphasic Personality Inventory ("MMPI") to Jones

that day. Dr. Berland told Showalter that the MMPI results indicated Jones had "a

long-standing psychotic disturbance," which was "a biological problem with the

brain" that could "either be genetic or due to brain damage." Dr. Berland

explained to counsel that the condition caused Jones to suffer from

"hallucination[s] and delusional paranoid thinking." Dr. Berland also told

Showalter that Jones had a "mood disturbance, a 'large manic problem'" which

10

could be "cyclical or permanent (from the brain damage)." Finally, Dr. Berland opined that this kind of mental illness might not appear on a brain scan, but he suggested that neuro-psychological testing was needed.

Defense counsel Cummings testified that, before Jones's trial had begun, he read Showalter's memo and a graph that he found in Jones's Department of Corrections ("DOC") records. However, Cummings did not contact Dr. Berland or have Jones evaluated by any other mental-health experts. At the time of Jones's trial, Cummings was not acquainted with Dr. Berland. He recalled that he had probably asked a psychologist he knew to interpret the graph he found in Jones's DOC records. Cummings said that he had probably made a conscious decision not to use a mental-health expert during the penalty phase based on what that psychologist had told him. He did not testify as to what the psychologist had told him, but he noted that he had highlighted some unfavorable information in psychological evaluations he found in Jones's DOC records, including notations that Jones was not suffering from any debilitating mental illness, that he exhibited no delusions or hallucinations, and that he displayed antisocial behavior and may have antisocial personality disorder. Cummings also highlighted a statement in one of the evaluations that Jones had broken into a house while completely nude, and the evaluating doctor's recommendation that Jones be placed in a mentally disordered sex offender ("MDSO") program.

11

The state, in turn, introduced Jones's DOC records, which included <u>three</u> separate psychological evaluations.  The first, performed by psychiatrist Dr. Manuel Guerrero in December 1977, noted that Jones had "denied hallucinations of any sort and no delusional ideas or ideas of reference were elicited."  Dr. Guerrero concluded that Jones was "not suffering from any mental illness."

The second evaluation was performed by DOC psychologist Dr. Hugo Santiago-Ramos in June 1978.  Dr. Santiago-Ramos explained that the Classification Department had asked him to evaluate Jones for possible transfer to an MDSO program because his offense conduct included the charge that he had broken into a home while completely nude.  Dr. Santiago-Ramos reported that, on the testing he administered, Jones "present[ed] several traits and symptoms usually associated with psychiatric disabilities," but the results were also consistent with antisocial personality disorder.  Dr. Santiago-Ramos noted that Jones might have "a schizophrenic process . . . which could become exacerbated under minimal stress and under circumstances different from those of actual incarceration." "[F]or example, . . . with the availability of illicit drugs on the streets, and his accessibility to them, he could easily decompensate and engage in aberrant sexual behaviors, such as those which account for his present incarceration." Finally, Dr. Santiago-Ramos recommended Jones be placed in an MDSO program.

The third evaluation, conducted in September 1978 by DOC psychiatrists Dr. Laura Parado and Dr. Eduardo Infante -- again at the request of the Classification Department -- noted that Jones was then serving a ten-year sentence for attempted robbery and burglary.  Drs. Parado and Infante observed that Jones was "a well developed, well nourished young black male in no acute physical distress," and he was "well oriented in all spheres."  Drs. Parado and Infante added that Jones experienced "[no] hallucinations or delusions," and his "[m]ood and affect [were] appropr[iate]."  The doctors therefore concluded that Jones was "not suffering from any mental illness."  Because he had no mental illness, and because he denied being a sex offender, he did not qualify for an MDSO program.  Instead, Drs. Parado and Infante recommended that Jones "receive counselling to learn more acceptable behavior."  Their overall "Diagnostic Impression" was that Jones had "Personality Disorder -- Anti-Social Personality."

Dr. Berland also testified on Jones's behalf at the post-conviction hearing. He evaluated Jones in February 2003, at the request of his post-conviction counsel. As part of the 2003 evaluation, Dr. Berland interviewed Jones for about five hours, reviewed the DOC records, reviewed Jones's medical records, and interviewed Jones's family members and friends.  Based on a review of all of these sources and the MMPI he administered in 1991, Dr. Berland opined that, at the time Jones murdered Young, he was suffering from a "biologically determined mental

13

illness," which included "mood disturbance, delusional paranoid thinking, and hallucinations." Dr. Berland also formed the opinion, based on his performance on the Wechsler Adult Intelligence Scale ("WAIS"), which had been administered by DOC doctors in 1978, that Jones had probably suffered brain injury prior to the homicide. Dr. Berland offered the opinion that, on account of his mental illness, Jones was under the influence of an extreme mental or emotional disturbance at the time he committed the homicide. See Fla. Stat. § 921.141(6)(b) (1991). In addition, Dr. Berland concluded, because of the combined effects of his biological mental illness and his intoxication at the time of the offense, Jones's ability to conform his conduct to the requirements of the law was substantially impaired. See id., § 921.141(6)(f).[3]

In rebuttal, the state presented testimony of its own mental-health expert, forensic psychologist Dr. Harry McClaren. While Dr. McClaren had not personally evaluated Jones, he reviewed the results of the MMPI Dr. Berland had administered in 1991. Dr. McClaren observed that Jones scored the highest on the fourth and eighth MMPI scales, which measure psychopathic deviation and

---

[3] Notably, during the penalty phase, trial counsel argued -- and the trial judge found at sentencing -- that Jones's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, based on his intoxication at the time of the offense. Jones, 648 So. 2d at 673. Trial counsel, who presented no mental-health mitigation evidence, did not argue that Jones was also under the influence of an extreme mental or emotional disturbance.

14

schizophrenia, and the next highest on the sixth scale, which measures paranoia.[4]

Dr. McClaren testified that this pattern is known in the psychological literature as

"4-8 with a high 6" or just the "4-8 profile," and it is often found among violent

criminals, child molesters, rapists, and exposists.  Dr. McClaren read from two

psychological treatises, which explained that individuals with the 4-8 profile often

have anger and resentful qualities, are moody and emotionally inappropriate,

engage in unpredictable and non-conformist behavior, frequently get into social

and legal difficulties, and often commit crimes that are poorly planned and may

involve bizarre and violent behaviors.  Dr. McClaren testified that the

circumstances surrounding the murder of Young, including that it involved

breaking one of Young's arms and ribs on both sides of his body, causing facial

injuries, and holding the victim's head under water until he drowned, fit the 4-8

profile.  Dr. McClaren also squarely disagreed with Dr. Berland's view that Jones's

performance on the WAIS administered by the DOC in 1978 was indicative of

brain damage.  In Dr. McClaren's view, Jones's performance on the test, which

showed a six-point split between verbal and performance IQ, was average.  He

explained, "There are an awful lot of normal [people] walking around with that

kind of split."  Dr. McClaren testified that, based on the information available to

---

[4] The MMPI consists of several hundred true-false questions, which correlate to one or more of ten clinical scales. Hittson v. GDCP Warden, 759 F.3d 1210, 1239 n.33, 1243 n.42 (11th Cir. 2014), cert. denied, 135 S. Ct. 2126 (2015).  Elevated scores on a given scale, or combinations of scales, statistically correlate to certain personality traits or personality disorders. Id. at 1243 n.42.

him, if he were to examine Jones, there was "an extremely high likelihood" he would render a diagnosis of antisocial personality disorder, and possibly post-traumatic stress disorder and substance abuse.

At the conclusion of the evidentiary hearing, the trial court said the following about Jones's shackling claim:

> There was a ground that was listed in the [amended Rule 3.850] motion that alleged that Mr. Jones was shackled during the trial. That was a totally false, false allegation, which I addressed earlier.
>
> He was, in fact, shackled during preliminary hearings. He was never shackled during jury selection or the trial. He has been shackled all today because we do not have a jury, but he was never shackled in front of the jury. Okay.
>
> I just want to put that on the record in as much as we and Counsel had addressed it earlier when we went over all the various grounds. I just want to put on the record in as much as he has been shackled for the last two days.

Ultimately, the state trial court denied Jones's Rule 3.850 motion in its entirety in two separate orders. The court rejected Jones's claim that trial counsel rendered ineffective assistance by failing to uncover and present mental-health mitigation evidence, concluding that Jones failed to show deficient performance. It did not address the issue of prejudice. The court also determined that Jones's shackling claim was procedurally barred under Florida law because it should have been raised on direct appeal and he could not "recast a claim that should have been raised on direct appeal as an ineffective assistance of counsel claim."

16

Alternatively, the court concluded that the claim was without merit because, as it had observed earlier, "at no time was Defendant shackled in front of jurors, prospective or otherwise," and "[c]ounsel cannot be deemed ineffective for failing to perform a useless act."

On appeal, the Florida Supreme Court affirmed the denial of post-conviction relief on both the mental-health mitigation and shackling claims, but on different grounds. Jones v. State, 998 So. 2d 573, 583-88 (Fla. 2008).

As for the mitigation claim, the Florida Supreme Court disagreed with the trial court and found that Cummings rendered deficient performance by failing to further investigate Jones's mental health in light of Showalter's memo. Id. at 583. However, the state's high court determined that Jones failed to prove he was prejudiced by the deficiency. Id. at 584-86. In the Florida Supreme Court's view, Dr. Berland's expert opinion regarding Jones's mental illness likely would have been more harmful than helpful because it would have brought with it evidence that Jones had antisocial personality disorder and a psychological profile often shared by child molesters and rapists. Id. at 585. Moreover, the strength of Dr. Berland's testimony would have been undermined by the evaluations of the DOC psychologists, who concluded that Jones did not suffer from a mental illness. Id. The court specifically referenced the evaluation of Drs. Parado and Infante, who described Jones as being well-oriented, well-developed, and well-nourished,

17

and who observed that Jones "exhibited well-organized speech patterns, no evidence of thought disorders, and no hallucinations." Id.

Finally, the Florida Supreme Court pointed to the significant aggravators established at the penalty phase -- that Jones had prior violent felony convictions, that he murdered George Young during the course of a robbery, and that the murder was especially heinous, atrocious, or cruel. Id. The court also cited the mitigators found by the trial court -- that Jones's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, that he had suffered from a traumatic and difficult childhood, and that he had the love and support of his family. Id. In the end, weighing all of the evidence, the new and the old, the good and the bad, the Florida Supreme Court concluded that the "enhanced mitigation" did not create a "probability sufficient to undermine [its] confidence in the outcome." Id. at 585-86.

The Florida Supreme Court did not address Jones's substantive shackling claim, but affirmed the denial of his related Sixth Amendment ineffective-assistance-of-counsel claim. Id. at 587-88. After reciting the controlling Strickland standard, see id.; see also id. at 582, the court found that the trial judge's "emphatic[] deni[al]" that Jones had been shackled during voir dire or at any subsequent phase of the trial was an insufficient reason for denying an evidentiary

hearing on the claim. Id. at 587-88. Rather, the court denied the claim because it was "legally insufficient" -- Jones failed to allege prejudice with sufficient detail and specificity. Id. at 587.

The Florida Supreme Court specifically observed that, under its case law, in order to be entitled to an evidentiary hearing on an ineffective-assistance-of-counsel claim, "the defendant must allege specific facts establishing both deficient performance of counsel and prejudice to the defendant." Id. (citing Rhodes v. State, 986 So. 2d 501, 513-14 (Fla. 2008); Doorbal v. State, 983 So. 2d 464, 483 (Fla. 2008); Spera v. State, 971 So. 2d 754, 758 (Fla. 2007)) (emphasis in original). The court fully recognized that "the use of shackles in view of the jury has the potential to prejudice a defendant." Id. at 588. However, in this case, Jones had only offered an allegation of prejudice at the highest order of abstraction and failed to specifically plead any prejudice sufficient to warrant an evidentiary hearing. Id. The court remarked that, in his amended Rule 3.850 motion, "Jones [did] not contend that any venire members who ultimately sat on his jury saw him in restraints," and "[a]bsent allegations that the actual jurors were exposed to Jones in shackles, he cannot demonstrate prejudice." Id. The court concluded, "[o]verall," that Jones had "failed to demonstrate how any alleged deficiency in counsel's performance in failing to challenge the use of shackles so affected the fairness and

reliability of the proceedings that confidence in the outcome is undermined."

Id. (quotation omitted).

### D. Federal Habeas Proceedings

Jones subsequently petitioned for federal habeas relief in the United States District Court for the Northern District of Florida. The district court denied habeas relief on Jones's mental-health mitigation claim, concluding that the Florida Supreme Court's prejudice analysis was not an unreasonable determination of controlling federal law. The court also denied relief on Jones's shackling claim,[5] concluding that the claim was meritless in light of the record -- in particular, the trial judge's factual finding that Jones had never been shackled in front of the jurors. In light of this ruling, the district court found it unnecessary to decide whether the Florida Supreme Court's prejudice analysis was contrary to or an unreasonable application of clearly established federal law. However, the district court granted a certificate of appealability ("COA") as to: (1) [w]hether the mental-health mitigation claim was properly denied"; and (2) "[w]hether the shackling claim was properly denied without an evidentiary hearing in state or federal court."

This timely appeal follows.

---

[5] The district court did not address whether it viewed that claim as a substantive shackling claim arising under the Due Process Clause of the Fourteenth Amendment, a Sixth Amendment ineffective-assistance-of-counsel claim, or both.

## II.

We review a district court's denial of federal habeas relief de novo. Peterka v. McNeil, 532 F.3d 1199, 1200 (11th Cir. 2008). No one disputes that the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to Jones's habeas petition. Under AEDPA, federal courts are barred from granting habeas relief on claims that were previously adjudicated on the merits in state court, unless the adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Our review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen v. Pinholster, 563 U.S. 170, 181 (2011). We must presume the state court's factual determinations are correct, unless the petitioner rebuts that presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[C]learly established Federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (quotation omitted). It includes only "the holdings, as opposed to the dicta, of [the Supreme]

Court's decisions as of the time of the relevant state-court decision.'" Id. at 71 (quotation omitted). In addition, a new constitutional rule of criminal procedure announced by the Supreme Court after the defendant's conviction became final does not apply in collateral proceedings, unless the new rule (1) "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," or (2) constitutes a "watershed rule[] of criminal procedure" that "implicate[s] the fundamental fairness of the trial." Teague v. Lane, 489 U.S. 288, 307, 310-13 (1989) (quotations omitted); see Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1311-12 (11th Cir. 2005); Turner v. Crosby, 339 F.3d 1247, 1282-83 (11th Cir. 2003). For a state-court decision to be "contrary to" clearly established federal law, the state court must have applied "a rule different from the governing law set forth in [the Supreme Court's] cases, or . . . decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002).

An "unreasonable application" under § 2254(d)(1) occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the] petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quotation omitted). To be unreasonable, "the state court's ruling on the claim being presented in federal court [must have been] so lacking in justification that there was an error well understood

22

and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).  Thus, "the state court's decision must have been more than incorrect or erroneous." Wiggins, 539 U.S. at 520.  It "must have been objectively unreasonable." Id. at 520-21 (quotation omitted).  "If [the AEDPA] standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102.

Moreover, we have stressed that, under § 2254(d)(1), "we review the state court's 'decision' and not necessarily its rationale." Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 785 (11th Cir. 2003) (citing Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002)).  Accordingly, we have "cautioned that overemphasis on the language of a state court's rationale would lead to a 'grading papers' approach that is outmoded in the post-AEDPA era." Parker, 331 F.3d at 785 (quotation omitted).  "Although a state court opinion containing a conspicuous misapplication of Supreme Court precedent would not be entitled to deference under [] AEDPA, we will not presume that a state court misapplied federal law, and absent indication to the contrary will assume that state courts do understand 'clearly established Federal law as determined by the Supreme Court of the United States." Id. at 785-86 (quotations omitted, alterations adopted); 28 U.S.C. § 2254(d)(1).

## III.

Jones first argues that Cummings rendered ineffective assistance at the penalty phase of his trial by failing to uncover and present mental-health mitigation evidence.  He challenges as unreasonable the Florida Supreme Court's determination that, while Cummings rendered deficient performance, he was not thereby prejudiced.

It is by now hornbook law that to succeed on a Sixth Amendment ineffective-assistance claim, a petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  To establish deficient performance, the petitioner must show that his attorney "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.  The Supreme Court has made it clear that counsel has a duty to conduct a reasonable investigation into plausible defensive options.  See id. at 690-91.  In the context of penalty-phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence -- such as mental illness or a history of childhood abuse -- may be available.  See Porter v. McCollum, 558 U.S.

30, 39-40 (2009); Wiggins, 539 U.S. at 524-26; Williams v. Taylor, 529 U.S. 362, 395-96 (2000).

On the issue of prejudice, the Supreme Court has explained that a reasonable probability of a different result means "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. When a petitioner challenges his conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. When a capital petitioner challenges his death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. To assess that probability, a reviewing court must "consider the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- and reweigh it against the evidence in aggravation." Porter, 558 U.S. at 41 (quotations omitted, alteration adopted).

The Florida Supreme Court's determination that Jones was not prejudiced by Cummings's failure to present mental-health mitigation evidence during the penalty phase was neither contrary to nor an unreasonable application of

Strickland.[6] First, we acknowledge that Dr. Berland's expert testimony would have been mitigating. In particular, Dr. Berland opined that, at the time of the homicide, Jones had a long-standing "biologically determined mental illness," which caused "mood disturbance, delusional paranoid thinking, and hallucinations." Based on the WAIS administered by the DOC in 1978, Dr. Berland concluded that Jones's mental illness was, at least in part, the result of brain injury. Dr. Berland testified that, because of the mental illness and Jones's intoxication at the time of the homicide, two statutory mitigating factors were satisfied, namely, that Jones was under the influence of an extreme mental or emotional disturbance when he murdered Young, Fla. Stat. § 921.141(6)(b) (1991), and his ability to conform his conduct to the requirements of the law was substantially impaired, id. § 921.141(6)(f).[7] However, as the Florida Supreme

---

[6] The state challenges the Florida Supreme Court's determination that Cummings rendered deficient performance under Strickland, but we discern no error. The United States Supreme Court has on numerous occasions found deficient performance under Strickland where trial counsel failed to follow up on information indicating additional mitigation evidence may be available. See Porter, 558 U.S. at 39-40; Wiggins, 539 U.S. at 524-26; Williams, 529 U.S. at 395-96. Here, the record establishes that Cummings had Showalter's memo in his file, which indicated that Jones had a "long-standing psychotic disturbance," which could be either genetic or due to brain damage; that he suffered from "hallucination[s] and delusional paranoid thinking;" that he had a "large manic problem;" and that he should have neuropsychological testing. Yet Cummings failed to have Jones further evaluated by a mental-health expert before deciding whether to pursue a mental-health mitigation strategy.

[7] Notably, the trial judge found at sentencing that Jones's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired based on his intoxication at the time of the offense. Jones, 648 So. 2d at 673. Thus, Dr. Berland's testimony supported only one additional statutory mitigating circumstance.

26

Court recognized, the mitigating value of Dr. Berland's testimony was undercut substantially by other mental-health evidence in the record that contradicted his opinion about Jones's long-standing mental illness, including: (1) Dr. Guerrero's 1977 evaluation, which concluded that Jones was "not suffering from any mental illness"; (2) Drs. Parado and Infante's 1978 evaluation, which came to the same conclusion; and (3) Dr. McClaren's disagreement with Dr. Berland's expert opinion that Jones's testing results were indicative of a psychotic mental illness, rather than an antisocial personality. Jones, 998 So. 2d at 585.

Moreover, as the Florida Supreme Court also recognized, had Dr. Berland testified at the penalty phase regarding Jones's mental illness, that testimony would have opened the door to a significant body of unfavorable and damaging evidence. Id. For one thing, the state would have been able to introduce the conclusions of Dr. Santiago-Ramos, Drs. Parado and Infante, and Dr. McClaren that Jones showed signs of antisocial personality disorder. And, we have often observed that evidence of a defendant's antisocial personality disorder can negatively impact the jury. See, e.g., Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368 (11th Cir. 2009) ("[I]n the mental health area, Cummings is left mainly with a diagnosis of antisocial personality disorder, which is not mitigating but damaging."); see also Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir. 1994)

27

(noting that, "by common definition," those who are antisocial "have little respect for social norms or the rights of others").

The state also would have been able to bring out information from Dr. Santiago-Ramos's report that one of Jones's prior offenses involved "[breaking] into a house while being completely nude," and, as a result, the DOC had him evaluated for placement in a mentally disordered sex offender program.[8]

Moreover, had Dr. Berland testified at the penalty phase, the state could have introduced Dr. McClaren's testimony that Jones's psychological profile, as revealed in the results of Dr. Berland's MMPI testing, matched a malignant pattern frequently found among violent criminals, child molesters, rapists, and exposists. This evidence, too, could have negatively affected the defense. Again,

---

[8] At oral argument, Jones's counsel argued that the facts of the burglary would be inadmissible because only a psychologist's ultimate conclusion regarding the defendant's mental state may be introduced. But, by presenting a mental-health mitigation defense, Jones plainly would open the door to evidence relevant to his mental health. See Jones v. GDCP Warden, 815 F.3d 689, 725 (11th Cir. 2016) ("[I]t is undeniable that a party may impeach an expert witness with materials the expert relied upon in reaching his opinion, or with materials that draw his very opinion into question."). While Jones is correct that, in a criminal trial in Florida, the state must limit its direct examination of a psychologist who conducted a court-ordered psychological exam to the doctor's ultimate conclusion as to the defendant's mental state, if the defendant opens the door to collateral issues, the state may then inquire about relevant information contained in the psychological report. See Booker v. State, 397 So. 2d 910, 913-14 (Fla. 1981). The fact that Jones had engaged in bizarre conduct in the past, including committing a burglary while completely nude, surely would have been relevant to any evaluation of his mental health. Thus, had Jones put on mental-health mitigation evidence, the state would have been able to bring out the facts surrounding the prior offense. Cf. Rhodes v. State, 547 So. 2d 1201, 1204 (Fla. 1989) ("[I]t is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction. Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence." (citations omitted)).

Dr. McClaren testified in detail about many negative characteristics often associated with the malignant 4-8 profile, including a tendency to commit poorly planned, violent crimes that involve bizarre and violent behaviors. As Dr. McClaren testified, Jones's murder of Young fit the 4-8 profile: it involved a violent attack on Young, smashing his arm and ribs, and then holding his head under water until he drowned. Jones's previous burglary of a home while completely nude also fit the profile Dr. McClaren had described. Thus, on balance, considering the extensive evidence that undercut Dr. Berland's testimony, and the significant negative evidence that would have accompanied Dr. Berland's expert opinion, the Florida Supreme Court could reasonably have found, as plainly it did, that Dr. Berland's proffered mental illness testimony would only have had limited mitigating value.

And, weighing on the other side of the scale are three substantial aggravators. In the first place, Jones murdered Young after being convicted of violent felonies on <u>four</u> prior occasions, all of which included attempted robbery, robbery, or armed robbery. <u>Jones</u>, 648 So. 2d at 673 & n.1. Second, in this case, too, Jones murdered Young during the course of a robbery. <u>Id.</u> at 672-73. And, as the trial court found, the murder was especially heinous, atrocious, or cruel. <u>Id.</u> at 673. The trial evidence showed that, after Young -- a stranger to Jones -- helped Jones carry his drunk friend, Hollis, out of a liquor store and drove the two men

home to Hollis's house, Jones took Young to a secluded pond, beat him savagely, and held his head under the pond water until -- as Jones later described it to his cellmate -- his head stopped "popping up." Id. at 672-73.

In closing argument during the penalty phase, the prosecutor summarized the suffering Jones inflicted on Young this way:

> Take each step physically of what happened to George Young. The medical examiner cataloged his injuries for you. Multiple lacerations on his forearm and on his left side. They are visible in the photographs if you want to look at them. He suffered a violent forcible blow to his left arm, breaking that bone in his left arm with sufficient force that it projected tendons, opened the skin and pushed tendons out of the wound. He also had, not depicted in the photographs, but painstakingly described by the doctor, lacerations and injuries to the left side of the head, the rear of the head and the right side of the head.

> The victim George Young was then forcibly drowned and in order for this to have occurred in shallow water so as to cause him to ingest and inhale these plant materials that were found, I would submit to you that he had to have been held down because of the violent paroxisms, the violent even involuntary motions of the body. It's hard to imagine what could be more heinous[,] atrocious[,] and cruel than what George Young was subjected to, what he went through that night, to have his head forced beneath and then held beneath that dark water. If he was lucky, he was already out of breath, because then it would not have taken as long for him to die, for him to experience as he lay there in what had to be excruciating pain, helpless with []his arm disabled, battered about the face and head, as he tried to hold his breath . . . . [M]aybe being out of breath from resisting the attack or the assault on him, he was not able to hold his breath that long. But whether in 30 seconds, a minute, two minutes, however long it took him before his body finally took over, his body finally betrayed him and with his head held down beneath that water and the water filling his ears, his body tried automatically to breathe, to breathe what could not sustain life, to breathe that water.

30

The doctor described what happens physiologically, what happened to George Young physiologically as he was subjected to this, the violent convulsive gasping and swallowing, completely without volition. It is not under your control. . . .Words really aren't sufficient to describe the mental suffering inflict[ed] on someone in that posture. The horrible second-by-second-by-second certainty of impending death, knowing if you open your mouth, you die. And then without volition, without will, opening your mouth and dying.

In the face of these powerful aggravators and the arguably limited mitigating value of Dr. Berland's testimony, Jones has not come close to showing that the Florida Supreme Court acted unreasonably in finding no prejudice on account of counsel's deficient performance.

Jones argues, nevertheless, that the Florida Supreme Court's decision was based on several unreasonable factual determinations. We remain unpersuaded. For starters, Jones says that the Florida Supreme Court erred by relying on Dr. McClaren's testimony because Dr. McClaren never evaluated Jones, he made no diagnoses of Jones, and his testimony regarding the malignant 4-8 profile was speculative. But a state court's decision to credit an expert witness's testimony is a factual finding, to which we are obliged to defer, unless the petitioner rebuts the finding with clear and convincing evidence. See Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000); 28 U.S.C. § 2254(e)(1). Jones has pointed to nothing in the record that meets this demanding standard. On this record, he has not established by clear and convincing evidence that the Florida Supreme Court was required to disregard Dr. McClaren's testimony simply because Dr. McClaren did not

31

personally evaluate Jones.  At the Rule 3.850 evidentiary hearing, Dr. McClaren made it abundantly clear that he did not personally evaluate Jones, and his expert opinions were based on reviewing the MMPI Dr. Berland administered in 1991, Jones's DOC records, and Dr. Berland's testimony at the post-conviction hearing. In deciding to credit Dr. McClaren's testimony, the Florida Supreme Court was able to take into account his sources and their limitations.  Nor would this be the first time, in the annals of expert testimony, that a factfinder relied on a medical expert who had not personally examined the individual he was evaluating.  See, e.g., Kimbrough v. Sec'y, DOC, 565 F.3d 796, 802 (11th Cir. 2009) (in capital case, noting defense expert who did not personally examine the petitioner testified at post-conviction hearing about potential statutory and non-statutory mitigators); Anderson v. Cytec Indus., Inc., 619 F.3d 505, 515 (5th Cir. 2010) ("That the independent experts reviewed Anderson's records but did not examine him personally . . . does not invalidate or call into question their conclusions."); Davis v. Unum Life Ins. Co. of Am., 444 F.3d 569, 577 (7th Cir. 2006) ("[O]ur research has not disclosed[] any authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files.  In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation."); see also Fed. R. Evid. 703 ("An

32

expert may base an opinion on facts or data in the case that the expert <u>has been</u> <u>made aware of</u> or personally observed." (emphasis added)); Fla. Stat. § 90.704 ("The facts or data upon which an expert bases an opinion or inference may be those perceived by, <u>or made known to</u>, the expert at or before the trial." (emphasis added)). Nor has Jones offered anything to establish, let alone by clear and convincing evidence, that the Florida Supreme Court was <u>required</u> to disregard Dr. McClaren's reading of Dr. Berland's MMPI testing to show that Jones's profile matched a malignant pattern recognized within the field of psychology.

Jones also claims that the Florida Supreme Court unreasonably determined that the only psychological diagnosis the experts could agree upon was that he had antisocial personality disorder. Jones points to the fact that Dr. Berland did not actually diagnose him with antisocial personality disorder, nor did Dr. McClaren, who made no diagnosis at all. But, in fact, Dr. McClaren testified that, based on all of the information available to him, there was "an extremely high likelihood" he would diagnose Jones with antisocial personality disorder if he were to evaluate Jones. In June 1978, DOC psychologist Dr. Santiago-Ramos had indicated that Jones may have an antisocial personality, and in September 1978, DOC psychiatrists Drs. Parado and Infante recorded their "Diagnostic Impression" that Jones had "Personality Disorder -- Anti-Social Personality." Moreover, while Dr. Berland did not diagnose Jones with antisocial personality disorder, even he

33

did not rule out this diagnosis. Thus, the Florida Supreme Court's determination that antisocial personality disorder was "[t]he only psychological diagnosis the experts could agree upon" was not unreasonable. Jones, 998 So. 2d at 585.

In the third place, Jones urges that the Florida Supreme Court unreasonably discredited Dr. Berland's expert opinion based on the DOC records. He takes particular issue with the court's reliance on the opinions of Drs. Parado and Infante that Jones was well-oriented, well-developed, and well-nourished, which he says "in no way refutes Dr. Berland's findings of mental illness." However, Jones's argument wholly ignores Drs. Parado and Infante's unambiguous finding that Jones did not suffer from mental illness. Indeed, Dr. Guerrero also concluded that Jones was "not suffering from any mental illness." The long and short of it is that the Florida Supreme Court did not unreasonably rely on these DOC evaluations, which found that Jones did not suffer from mental illness, and it did not unreasonably reject the thrust of Dr. Berland's testimony that Jones suffered from a longstanding, biologically determined mental illness.

Finally, Jones says that the Florida Supreme Court's prejudice analysis was contrary to clearly established federal law because the court did not evaluate the totality of the available mitigation evidence and reweigh it against the evidence in aggravation. See Porter, 558 U.S. at 41. But the record shows quite the opposite. The court considered, in mitigation, both Dr. Berland's testimony and the

34

mitigating evidence presented at the original penalty phase, including the trial court's findings that Jones's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, that he suffered from a traumatic and difficult childhood, and that he had the love and support of his family. Jones, 998 So. 2d at 584-86. The court then weighed all of this mitigating evidence against the statutory aggravators found by the trial court and the state's rebuttal evidence from the Rule 3.850 hearing. Id. at 585-86.

In short, considering the significant aggravators in this case, the limited mitigating value of Dr. Berland's testimony, and the unfavorable evidence Dr. Berland's testimony would likely have brought in its wake, Jones has not shown that the Florida Supreme Court's determination that he was not prejudiced by counsel's failure to present mental-health mitigation evidence was an unreasonable one.

## IV.

Jones's second claim is that trial counsel rendered ineffective assistance by failing to object when Jones was allegedly shackled in view of the venire panel

during jury selection.[9] We conclude that Jones was neither entitled to an evidentiary hearing nor federal habeas relief on this claim.

In the state collateral proceeding, the trial court denied Jones's claim because he failed to raise any type of shackling claim on direct appeal and he could not circumvent the resulting procedural bar by recasting the claim as one of ineffective assistance of counsel. The judge denied the claim without holding an evidentiary hearing because he had presided over the trial and recalled that Jones had not been shackled at any point in front of the venire or the ultimate jury panel. The Florida Supreme Court did not endorse either rationale of the trial court for denying the ineffective assistance of counsel claim and instead affirmed the denial of it because:

> Jones makes a conclusory allegation of prejudice and fails to specifically plead any prejudice sufficient to warrant an evidentiary hearing. Jones does not contend that any venire members who ultimately sat on his jury saw him in restraints. Absent allegations that the actual jurors were exposed to Jones in shackles, he cannot demonstrate prejudice.

[9] Jones's state-court pleadings, and even his pleadings and appellate briefing in this § 2254 proceeding, are unclear as to whether he raised in the state collateral court a substantive shackling claim under the Due Process Clause of the Fourteenth Amendment, an ineffective-assistance claim under the Sixth Amendment, or both. While the state trial court appears to have read Jones's amended Rule 3.850 motion to raise both types of claims, on appeal from the denial of collateral relief the Florida Supreme Court read that pleading as raising only a Sixth Amendment ineffective-assistance-of-counsel claim. At oral argument, the parties agreed that the only claim at issue in this appeal is an ineffective-assistance claim, so we read the pleadings accordingly. We add that, to the extent Jones raised a substantive shackling claim in state court, the state trial court found that it was procedurally barred because Jones failed to raise it on direct appeal. See Caniff v. Moore, 269 F.3d 1245, 1246-47 (11th Cir. 2001) (holding that Florida's procedural requirement that defendants raise certain grounds on direct appeal is an independent and adequate state ground that bars federal habeas relief).

Jones, 998 So. 2d at 588 (footnote omitted).

According to Jones, the Florida Supreme Court's decision was the last state-court decision on the merits, and it was an unreasonable one. In contrast, the state contends that the Florida Supreme Court decision addressed only whether the trial court in the collateral proceeding was required to hold an evidentiary hearing, meaning that the state trial court's decision in that proceeding was the last decision on the merits of the shackling issue. And, the state adds, the trial court's decision was reasonable.

In order to simplify matters, we will make five assumptions in Jones's favor concerning his ineffective-assistance-of-counsel claim. We will assume: (1) that Jones adequately pleaded the claim in state court; (2) that, as a matter of state law, the state trial judge should not have relied on his personal recollection to determine whether Jones had been in shackles in view of the venire; (3) that the failure to develop in state court an evidentiary basis for the claim is not attributable to Jones; (4) that the Florida Supreme Court's rejection of the claim was on the merits, so there is no procedural bar;[10] and (5) that, for whatever reason, no deference is due

_____

[10] Contrary to the state's claim, the Florida Supreme Court's reference to Florida's "specific plead[ing]" requirement in rejecting Jones's shackling claim, see Jones, 998 So. 2d at 558, does not establish that its decision was based exclusively on state law. In fact, we have repeatedly held that the state court's denial of a petitioner's federal claim without an evidentiary hearing for failure to satisfy a "specific pleading" requirement constitutes a decision on the merits. See Pope v. Secretary for Department of Corrections, 680 F.3d 1271 (11th Cir. 2012) ("[J]ust as under our federal procedural rules, a Florida state court's dismissal of a post-conviction claim for facial insufficiency constitutes -- at least for purposes of the procedural

37

that decision, see Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a)."). We can make all of those assumptions because, even with them, the claim is still due to be denied since Jones has not carried his burden of showing that he was prejudiced by trial counsel's failure to object to the alleged shackling; nor has he otherwise established that the district court abused its discretion in failing to grant an evidentiary hearing on this largely barren record.

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011); see also Dickson v. Wainwright, 683 F.2d 348, 351 (11th Cir. 1982) ("We emphasize that the burden is on the petitioner in a habeas corpus proceeding to allege sufficient facts to support the grant of an evidentiary hearing and that this court will not blindly accept speculative and inconcrete claims as the basis upon which a hearing will be ordered." (quotation marks omitted)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the

default analysis -- a ruling 'on the merits' that is not barred from our review."); see also Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1260 (11th Cir. 2016) ("Summary dismissals under [Alabama's specific pleading rules] are adjudications on the merits and subject to AEDPA review."); Borden v. Allen, 646 F.3d 785, 814-15 (11th Cir. 2011) (same).

petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007). "That means that if a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." Chavez, 647 F.3d at 1060; see also Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 763 (11th Cir. 2010) ("Having alleged no specific facts that, if true, would entitle him to federal habeas relief, Allen is not entitled to an evidentiary hearing."). The allegations must be factual and specific; conclusory allegations are simply not enough to warrant a hearing. See Chavez, 647 F.3d at 1061; see also San Martin v. McNeil, 633 F.3d 1257, 1271 (11th Cir. 2011) ("'An evidentiary hearing may be necessary where the material facts are in dispute, but a petitioner is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics.'") (quoting Pugh v. Smith, 465 F.3d 1295, 1300 (11th Cir. 2006)); Boyd v. Allen, 592 F.3d 1274, 1306–07 (11th Cir. 2010) ("On this scant record, we cannot say that Boyd's allegations amount to anything more than the merely conclusory, nor that the district court has abused its considerable discretion in failing to hold a hearing on his claim." (citations omitted)).

Moreover, a petitioner seeking an evidentiary hearing must make a "proffer to the district court of any evidence that he would seek to introduce at a hearing."

Chandler v. McDonough, 471 F.3d 1360, 1363 (11th Cir. 2006); see also Drew v. Dep't of Corr., 297 F.3d 1278, 1293 n.7 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); Hill v. Moore, 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief."). We review the district court's denial of an evidentiary hearing only for an abuse of discretion. See Chavez, 647 F.3d at 1060. "A district court abuses its discretion if it misapplies the law or makes findings of fact that are clearly erroneous." Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1333 (11th Cir. 2004).

Jones's factual allegations contained in his verified Rule 3.850 motion were, in their entirety: "Mr. Jones was shackled in view of the jury at his capital trial. During voir dire, Mr. Jones was shackled in front of the venire. Members of the venire, from which the ultimate jury panel was selected, had a full view of the shackles which were placed on Mr. Jones." The record does not help to establish whether Jones was, in fact, shackled. The trial transcript gives no indication that Jones was shackled during jury selection. And the trial judge emphatically denied that Jones had been shackled at any point in the presence of the jury.

On appeal in his Rule 3.850 proceedings, Jones informed the Florida Supreme Court that, had the trial court granted him an evidentiary hearing on his shackling claim, he would have been prepared to call witnesses to "substantiat[e] his claim that a shackling device was utilized in front of the jury," including "members of the jail staff, Mr. Jones' trial attorney, and at least one member of the media." Notably, however, Jones did not make this representation to the state trial court. Moreover, apart from the bare allegations in his verified Rule 3.850 motion, Jones has never -- either in state or federal court -- submitted an affidavit from anyone regarding the specifics of the alleged shackling.

Viewing this record, the district court denied Jones's request for an evidentiary hearing because the state trial judge said on the record that Jones was not shackled and, "[i]n the absence of a basis to doubt the record, [Jones's] unsupported assertion that the record is inaccurate is ordinarily not enough to require a hearing." Even assuming that Jones exercised sufficient diligence in his state court pursuit of an evidentiary hearing -- as we have done -- he has not established that the district court abused its considerable discretion in denying him a federal evidentiary hearing. Again, the only evidence that he proffered in federal court is his brief statement in his verified Rule 3.850 motion that he was shackled in some unspecified manner, for some indeterminate time, in view of some members of the venire panel during the jury selection process. Balancing this brief

41

proffered evidence against the trial judge's statement and this barren record, the district court could reasonably determine, as it did, that over two decades after his trial, Jones had not presented enough by way of specific factual averment or proffer to entitle him to an evidentiary hearing on this claim.

Moreover, even taking Jones's shackling allegations as true, an evidentiary hearing would not enable Jones to show entitlement to federal habeas relief because he has not established that the shackling actually prejudiced him. See Strickland, 466 U.S. at 694. At the outset, Jones argues that he need not establish actual prejudice under Strickland because, under Deck v. Missouri, 544 U.S. 622, 635 (2005), shackling in view of the jury is presumptively prejudicial and the burden rests with the state to prove that the shackling was harmless beyond a reasonable doubt. But Jones misunderstands the impact of Deck on his ineffective assistance of counsel claim.

In Deck, a capital case on direct review before the Supreme Court, the defendant claimed that he was shackled during the penalty phase of his trial, in violation of his Fifth and Fourteenth Amendment rights. 544 U.S. at 625-26. The defendant did not raise a Sixth Amendment claim because defense counsel had repeatedly objected to the shackles during the trial. See id. at 625. The Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its

42

discretion, that they are justified by a state interest specific to a particular trial."

Id. at 629.  The Court explained that shackling is "inherently prejudicial," id. at

635,  because it may imply that the court authorities consider him a danger to the

community, id. at 633.  Thus, the Court concluded, where a defendant is shackled

in the absence of a special need, he "need not demonstrate actual prejudice to make

out a due process violation"; rather, the state has the burden to "prove 'beyond a

reasonable doubt that the [shackling] error complained of did not contribute to the

verdict obtained.'"  Id. (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

In Marquard v. Secretary for Department of Corrections, 429 F.3d 1278

(11th Cir. 2005), we specifically discussed, and at some length, the impact of the

Supreme Court's holding in Deck on a Sixth Amendment ineffective-assistance

claim.  There, we explained that, while Deck altered the burden of proof in a

substantive shackling claim brought under the Due Process Clause, it did not affect

the petitioner's burden to prove actual prejudice when raised in an ineffective

assistance of counsel claim on collateral review:

> Deck did not involve an [ineffective-assistance] shackling claim on
> collateral review but instead involved a direct appeal where trial
> counsel objected to shackling before the jury.  While Deck shifted the
> burden to the state on direct appeal to prove that routine shackling
> without a specific-needs inquiry did not contribute to the verdict,
> Deck did not address, much less alter, the burden and different
> required prejudice showing on Marquard's [ineffective-assistance]
> shackling claim.  After Deck, Marquard still has the burden in his
> [ineffective-assistance] shackling claim to establish a reasonable

43

probability that, but for his trial counsel's failure to object to [the] shackling, the result of his sentencing would have been different.

Thus, in this case, Marquard still must show a reasonable probability that, absent his being shackled, the sentencer would have concluded that the balance of aggravating factors and mitigating factors did not warrant death and would have imposed a life sentence.

Id. at 1313-14 (citation and footnote omitted).[11] In other words, Deck does not alter Jones's burden to establish actual prejudice under Strickland in order to sustain his Sixth Amendment claim.

Accepting Jones's allegation that he was shackled, there is no "reasonable probability" that if the jury had not seen Jones in shackles it would have acquitted him or would not have returned an advisory verdict recommending a death sentence. Strickland, 466 U.S. at 694. The evidence establishing Jones's guilt was overwhelming. Several witnesses testified that they saw Jones with Young, in

---

[11] Other Circuits have reached the same conclusion. See Walker v. Martel, 709 F.3d 925, 941 (9th Cir. 2013) ("[W]e are of course not analyzing [the petitioner's ineffective-assistance shackling] claim under a due process framework, but rather against ineffective assistance of counsel precedents and the test for prejudice outlined in Strickland. Strickland requires an actual finding that it is reasonably probable that, but for the unprofessional errors, the outcome at trial would have been different. Even if Deck had been clearly established Supreme Court precedent in 2004, its presumed-prejudice holding would not have controlled our determination on [the petitioner's] ineffective assistance of counsel claim."); Stephenson v. Wilson, 619 F.3d 664, 671 (7th Cir. 2010) ("Had Stephenson challenged the stun belt on direct appeal, the state would have had to prove beyond a reasonable doubt that the stun belt had not influenced the verdict. But because he alleges only that his counsel was ineffective in failing to challenge the stun belt, he must show that he was prejudiced by counsel's error. The burden of proving prejudice is on him because to prevail on a claim of ineffective assistance a defendant must show not only that counsel's performance fell below minimum professional standards but also that the subpar performance harmed the client." (citation omitted)).

Young's pickup truck, on the night Young was murdered. See Jones, 648 So. 2d at 672. He was the last person seen with Young, at some time between 7:30 and 8:00 p.m. the night of the murder. Id. Shortly thereafter, at approximately 8:05 p.m., Young's truck was involved in an accident, and Jones was the only person in the truck when paramedics arrived. Id. Cash and lottery tickets were found in Jones's pockets, and those lottery tickets had been purchased at the same place and at the same time as lottery tickets found in Young's truck. Id. Five days later, on June 6, 1991, Young's body was found in Boat Pond on Horseshoe Plantation. Id. Witnesses testified that they had seen Jones fishing in other ponds on that plantation. Id. Jones's clothing from June 1 contained soil and pollen that were similar to samples taken from Boat Pond. Id. A medical examiner determined that Young was alive at the time he entered Boat Pond; that he died as a result of freshwater drowning; and that he had suffered numerous premortem injuries, including a fractured arm and several fractured ribs. Id. Not only that, but in the presence of two of his cellmates Jones admitted to killing Young. Id. at 672-73. One cellmate was able to describe the murder in detail based on Jones's confession, including that Jones had met Young at a liquor store, convinced him to help take his intoxicated friend home, attempted to rob him, broke his arm, and then killed him by holding his head under the water until it stopped "popping up." Id.

45

Given the strong evidence of Jones's guilt, there is no reasonable probability that the alleged shackling, if it did occur, had any impact on the jury's guilty verdict.  In light of this evidence against him, even if the jurors had seen Jones in shackles during jury selection, it would not undermine our confidence in the jury's verdict convicting him of first-degree murder, robbery, and grand theft.  Strickland, 466 U.S. at 694.

Nor is there any reasonable probability that seeing Jones in shackles during jury selection affected the jury's decision to recommend the death penalty.  As we have discussed at considerable length, see supra at pp. 31-33, the evidence independently established that Jones was a violent recidivist who murdered a complete stranger who had been attempting to help Jones and his friend.  Jones had previously been convicted of violent felonies on four separate occasions and, continuing this pattern of escalation, he murdered Young during the course of a robbery.  Jones violently beat Young, breaking several ribs, breaking a bone in his arm so severely that it ruptured the skin and pushed tendons out of the wound, and causing multiple lacerations on his forearm, left side, and head.  Jones then held Young's head under water until he drowned -- a horribly painful way to die that the state's expert described in detail, and the prosecutor reiterated in his closing argument.  All of that is powerful aggravating evidence.

46

The mitigation evidence Jones presented was not insignificant, but it paled in comparison to the aggravating evidence. Jones and his sister testified about his difficult childhood, which included witnessing parental abuse in the home, being abandoned by his father, and dealing with his mother's killing of his stepfather and her subsequent incarceration for that crime. Jones also testified that he was intoxicated at the time of the murder, and counsel argued that Jones's ability to conform his conduct to the requirements of the law was substantially impaired. After only 85 minutes of deliberations, the jury recommended by a vote of ten to two that Jones be sentenced to death.

In light of Jones's violent criminal past, the lack of provocation for the crime, the horrific suffering he inflicted on Young, and the relatively weak mitigating evidence, even if we review the claim de novo and do not afford the Florida Supreme Court's determination any deference, there is no reasonable probability that seeing Jones in shackles during jury selection caused the jurors to vote for death when they otherwise would not have. That the jury deliberated for less than an hour and a half and then recommended death by a strong majority suggests that it did not view this as a close or difficult case. While we recognize the inherent risk of prejudice from shackling, at most, the jurors saw Jones in shackles for one day out of a five-day trial. The fact that he was unshackled for the great majority of the trial, including the entire time the jury was in the box hearing

evidence and arguments, also weighs against a finding of prejudice.  For these reasons, our confidence in the reliability of the guilty verdict and in the jury's recommendation of death is not undermined.  We affirm the district court's denial of habeas relief.  See Strickland, 466 U.S. at 694.

**AFFIRMED.**